**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JANE SMITH, JILL PARK, MARY DOE,
ANN JONES, and DR. AMY MOE,

*Plaintiffs*,

*v.*

ANDREW CUOMO, as Governor of the
State of New York in his official capacity;
LETITIA JAMES, as Attorney General of
the State of New York in her official
capacity; DEIRDRE ASTIN, Deputy
Director, Division of Hospitals and
Diagnostic and Treatment Centers, New
York State Department of Health in her
official capacity; ARTHUR S. HENGERER,
M.D., Chair, New York State Department of
Health Office of Professional Medical
Conduct in his official capacity; HOWARD
A. ZUCKER, M.D., J.D., Commissioner of
Health for New York State in his official
capacity; Deputy Commissioner SARAH
BENSON, New York State Education
Department's Office of the Professions in
her official capacity; DONNA
FRESCATORE, New York Medicaid
Director, in her official capacity; SHEILA J.
POOLE, Commissioner of the New York
State Office of Children and Family
Services (OCFS), in her official capacity;

*Defendants.*

---

Civil File No. ___5:21-CV-0035 (LEK/ATB)___

**CLASS ACTION**

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
DAMAGES**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

**COMPLAINT AND JURY DEMAND** ....................................................................................1

**PRELIMINARY STATEMENT** ...........................................................................................1

**PARTIES** ...................................................................................................................................9

    **Plaintiffs** ...........................................................................................................................9

    **Defendants** .......................................................................................................................10

**JURISDICTION AND VENUE** ..........................................................................................14

**LEGAL CHANGES DUE TO PASSAGE OF THE REPRODUCTIVE HEALTH ACT** ......15

**CLASS ACTION ALLEGATIONS** ....................................................................................19

    **Violence Against Women Class** ....................................................................................20

    **Women Lacking Recourse Class** ..................................................................................20

    **Viable Unborn Children Class** .....................................................................................25

    **Abortion Survivors Class** .............................................................................................30

    **Physician Class** .............................................................................................................33

**FACTUAL ALLEGATIONS** .............................................................................................36

    **History of New York Abortion Law and Rights of Viable Unborn Children Prior to Passage of the RHA** ....................................................................................................36

    **Human Development** ....................................................................................................40

    **New York Abortion Practice** .......................................................................................41

    **Reasons for and Dangers of Late-Term Abortion** .....................................................44

    **Termination of Pregnancy Through Delivery and Surrender** ....................................46

    **Prenatal Loss** ................................................................................................................47

    **Risk of Violence During Pregnancy** ...........................................................................48

**COUNT I** ............................................................................................................................52

**SECTION 125.05 OF THE NEW YORK PENAL LAW, AS AMENDED BY THE RHA,**

**VIOLATES THE SUBSTANTIVE DUE PROCESS RIGHTS OF PLAINTIFFS JANE SMITH, JILL PARK, THE VIOLENCE AGAINST WOMEN AND WOMEN LACKING RECOURSE CLASSES.** ................................................................................ **52**

**COUNT II** ....................................................................................................... **54**

**SECTION 125.05 OF THE NEW YORK PENAL LAW, AS AMENDED BY THE RHA, VIOLATES THE CONSTITUTIONAL RIGHT TO LEGAL REDRESS OF PLAINTIFFS JANE SMITH, JILL PARK, AND THE WOMEN LACKING RECOURSE CLASS.** .......... **54**

**COUNT III** ...................................................................................................... **56**

**SECTION 2599-BB OF NEW YORK PUBLIC HEALTH LAW VIOLATES THE SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION RIGHTS OF VIABLE UNBORN CHILDREN BY PERMITTING THEIR DESTRUCTION FOR ANY REASON UP TO TWENTY-FOUR WEEKS GESTATION, OR, AFTER TWENTY-FOUR WEEKS GESTATION, FOR BROAD HEALTH REASONS, AND BY DECRIMINALIZING ASSAULTS ON AN UNBORN VIABLE CHILD.** ................................................. **56**

**COUNT IV** ...................................................................................................... **62**

**SECTION 125.05 OF THE NEW YORK PENAL LAW, AS AMENDED BY THE RHA, VIOLATES THE CONSTITUTIONAL RIGHT TO LEGAL REDRESS OF THE VIABLE UNBORN CHILDREN CLASS.** ............................................................................ **62**

**COUNT V** ........................................................................................................ **64**

**THE REPEAL OF THE SECOND PHYSICIAN REQUIREMENT FOR ABORTIONS AFTER VIABILITY VIOLATES THE SUBSTANTIVE DUE PROCESS RIGHTS OF CHILDREN BORN ALIVE DURING ATTEMPTED ABORTIONS AFTER THE TWENTIETH WEEK OF PREGNANCY.** ....................................................... **64**

**COUNT VI** ...................................................................................................... **66**

**THE FAILURE TO ENSURE PROPER REPORTING OF LIVE BIRTHS RESULTING FROM ATTEMPTED ABORTIONS AFTER VIABILITY VIOLATES THE EQUAL PROTECTION RIGHTS OF THE ABORTION SURVIVORS CLASS.** ................... **66**

**COUNT VII** ..................................................................................................... **71**

   **TWO TERMS OF SECTION 2599-BB.1 OF NEW YORK PUBLIC HEALTH LAW ARE VOID FOR UNDUE VAGUENESS.** ................................................................... **71**

**COUNT VII (A)** ................................................................................................ **73**

**SECTION 2599-BB.1 OF NEW YORK PUBLIC HEALTH LAW IS VOID FOR VAGUENESS BECAUSE IT FAILS TO DEFINE WHO IS AUTHORIZED TO PERFORM ABORTIONS.** .................................................................................................. **73**

   **COUNT VII (B)** .............................................................................................. **75**

**SECTION 2599-BB.1 OF NEW YORK PUBLIC HEALTH LAW IS VOID FOR VAGUENESS BECAUSE IT FAILS TO DEFINE THE CIRCUMSTANCES WHEN A POST-24 WEEK ABORTION WOULD BE NECESSARY TO PROTECT A PATIENT'S LIFE OR HEALTH.** .............................................................................................. **75**

**PRAYER FOR RELIEF** .................................................................................... **78**

**DEMAND FOR TRIAL BY JURY** .................................................................... **81**

**NOTICE OF TRIAL COUNSEL** .............................................................**81**

**CERTIFICATE OF SERVICE** .............................................................**81**

**CERTIFICATION**.............................................................................**82**

**EXHIBITS**

    **A.  Copy of RHA**

    **B.  Vital Statistics of New York State 2017, Induced abortions Tables 19 & 25**

    **C.  Declaration of Priscilla K. Coleman, Ph.D., dated December 1, 2020**

    **D.  Declaration of Martha W. Shuping, M.D., dated December 1, 2020**

    **E.  Declaration of Kathi Aultman, M.D., dated December 14, 2020**

## COMPLAINT AND JURY DEMAND

Plaintiffs Jane Smith, Jill Park, Mary Doe, Ann Jones, and Dr. Amy Moe, by and through their counsel, Christen E. Civiletto, Esq. and Teresa S. Collett, Esq., file this Complaint against defendants New York Governor Andrew M. Cuomo in his official capacity; New York Attorney General Letitia James in her official capacity; Deirdre Astin, in her official capacity as Deputy Director of the Division of Hospitals and Diagnostic and Treatment Centers; Howard A. Zucker, M.D., J.D. in his official capacity as Commissioner of the New York State Department of Health; Sarah Benson, Deputy Commissioner of the New York State Education Department's Office of the Professions in her official capacity; Donna Frescatore, New York Medicaid Director, in her official capacity;  Arthur S. Hengerer, in his official capacity as Chair, New York State Department of Health Office of Professional Medical Conduct; and Sheila J. Poole, in her official capacity as Commissioner of the New York State Office of Children and Family Services (collectively, "Defendants"), and respectfully demand a jury trial and allege as follows:

## PRELIMINARY STATEMENT

1.      This is an action under the United States Constitution and federal laws brought by the above-named Plaintiffs, individually and collectively, to challenge certain amendments and provisions of the New York Reproductive Health Act ("RHA"), NY LEGIS 1 (2019), 2019 Sess. Law News of N.Y. Ch. 1 (S. 240) (McKINNEY'S). More specifically, Plaintiffs challenge the validity of Public Health Law §2599-BB.1, a provision introduced into New York law as part of the RHA, New York Penal Law §125.05, as modified by the RHA, and the repeal of Public Health Law §4164 by the RHA. The RHA was passed by the New York State Legislature and signed into law by defendant Governor Andrew M. Cuomo on January 22, 2019. A copy of the

1

RHA is attached hereto as Exhibit "A."

2.      New York's RHA is based on a willful and tragic exaggeration of the right to abortion created by the Supreme Court in *Roe v. Wade*, 410 U.S. 113 (1973) and its progeny. It violates the fundamental rights of women, viable unborn children, and children surviving attempted abortions.

3.      Through their actions, New York officials have converted a woman's *liberty interest in terminating her pre-viable pregnancy* into a novel "right" to kill *viable* unborn children. Inexplicably, the RHA extends this putative "right" to kill beyond pregnant mothers to third-party criminal assailants. Indeed, in a change that alters nearly two hundred years of penal law, a murderer can no longer be prosecuted under New York law for the killing of a wanted, viable unborn child.

4.      Plaintiffs challenge these provisions of the RHA on five general grounds: (i) New York Public Health Law §2599-BB.1 is *unconstitutional in scope* because the post-twenty-four weeks "health" exception for an abortion should, on substantive due process and equal protection grounds, be limited to abortions that are necessary to prevent the death of the mother, or a serious risk of the substantial and irreversible impairment of a major bodily function of the mother; (ii) it contains an *unlawful legislative presumption* of viability at twenty-four weeks gestation; (iii) it *unlawfully redefines "person"* to exclude viable unborn children when referring to homicide under the New York Penal Code; (iv) a provision of the RHA creates an *unlawful threat to children surviving an abortion* as a result of repealing the prior requirement of New York Public Health Law § 4164. Repealed by L.2019, c. 1, § 3, eff. Jan. 22, 2019, McKinney's Public Health Law § 4164 second physician must be present for abortions performed after the twentieth week of pregnancy; and (v) New York Public Health Law §2599-BB.1  is *void for*

*vagueness* because two operative provisions of the RHA are so vague as to render them in need of reformation to provide "persons of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."

5.     It is important to understand that the RHA permits on-demand – for any reason, or no reason – abortion of unborn children up to twenty-four weeks gestation, *including unborn children who have attained viability*.

6.     After twenty-four weeks gestation, the RHA permits the abortion of an unborn child when an unspecified "health care practitioner" – not only a physician – determines that an abortion is necessary to protect the mother's life or "health," or that the unborn child is not viable. The RHA fails to define "health," and the reference to a "health care practitioner" is unconstitutionally vague, since multiple professionals are licensed under Title 8 of the Education Law, and not all have a defined "scope of practice."

7.     The RHA goes one step further. It ignores the humanity of unborn children by decriminalizing the killing of a child in *utero* by *any* third party. It redefines the term "Person" when referring to the victim of a homicide as a "human being who has been born and is alive." New York Penal Law §125.05. There is now no legal difference in the criminal law between an attack on a pregnant woman that results in the death of her unborn child, and an attack on a woman who is not pregnant. In other words, there is no separate charge based on the death of the child.

8.     These changes in New York law, introduced by the RHA, put women in danger. Pregnant women are already at an increased risk of intimate partner violence. Declaration of Priscilla K. Coleman, Ph.D., dated December 1, 2020 ("Coleman Decl.") ¶¶ 44-53. Under current New York law, women are vulnerable through the entire nine months of pregnancy to partners or others

who badger, pressure, threaten or physically abuse them to coerce the women to obtain an allegedly legal abortion. Physical attacks on women, as well as the number of women undergoing forced abortion, may increase due to the extension of the time within which an allegedly legal abortion can be obtained. By decriminalizing the killing of a viable unborn child and adopting vague conditions for post-viability abortions, New York has lengthened the period of time in which the woman is vulnerable. *See* Declaration of Martha W. Shuping, M.D., dated December 1, 2020 ("Shuping Decl.") ¶¶ 16-23, 62.

9.      By disregarding the state's obligation to promote the safety of women and by removing legal sanctions for fetal homicide and post-viability abortions that are not based on the life or physical health of the mother, while eliminating the second physician requirement for abortions performed after the twentieth week of pregnancy, the State has "affirmatively enhance[d] the risk of violence" against pregnant women seeking to continue their pregnancy to term, their viable unborn children, and children surviving abortions attempted after the twentieth week of pregnancy. *See Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009).

10.     In the name of effectuating court-determined abortion rights, New York distorts the holdings of *Roe v. Wade* and its progeny. 410 U.S. 113 (1973). In *Roe v. Wade*, the U.S. Supreme Court recognized that a woman has a right to choose to have an abortion before fetal viability and to obtain it without undue interference from the State, absent a threat to the woman's health and safety. *Roe v. Wade*, 410 U.S. at 162-164.

11.     The *Roe* majority emphasized that this judicially created right to abortion is <u>not</u> absolute and that a woman is <u>not</u> "entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses." *Roe v. Wade*, 410 U.S. at 153 (1973).

12.     Intentionally "terminating a pregnancy" (or induced abortion) ends the life of a whole, separate, unique, living human being – a being that is an "individual living member of the species of Homo sapiens, including the unborn human being during the entire embryonic and fetal ages from fertilization to full gestation." *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 735–36 (8th Cir. 2008) (*en banc*).

13.     In *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), a decision that reexamined the essential holdings of *Roe v. Wade*, the Court characterized abortion not as a "fundamental right," but as a liberty interest.   In reaffirming that there is no general constitutionally protected "right" that permits a post-viability abortion except in cases where the life of the mother or her health necessitates the procedure, the Court upheld the Pennsylvania law limiting post-viability abortions to "condition[s] which, on the basis of the physician's good faith clinical judgment, so complicate[] the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function." *Id*. at 779.

14.     In explaining these limitations, the *Casey* plurality identified viability as the point in time when there is "a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman." *Id*. at 870. Once the unborn child achieves viability, the woman's interest in terminating her pregnancy and the State's interest in protecting the unborn child can be simultaneously satisfied by delivering the child alive.

15.     The Court has consistently held that the determination of fetal viability is a medical judgment, not a legislative one. "The time when viability is achieved may vary with each pregnancy, and the determination of whether a particular fetus is viable is, and must be, a matter

for the judgment of the responsible attending physician." *Planned Parenthood v. Danforth*, 428 U.S. 52 at 64 (1976).

16.     Prior New York statutes permitted a woman to terminate her pregnancy by induced abortion for any reason up through twenty-four weeks from the commencement of a woman's pregnancy, based on the judicial and legislative assumption that viability was not possible prior to twenty-four weeks. After twenty-four weeks gestation, induced abortion was legal only if necessary to protect the life of the woman. N.Y. Penal Law § 125.05 (3), as amended by Chapter 127 of the Laws of 1970 effective July 1, 1970.

17.     This twenty-four weeks limit on abortion reflected the medical reality in the early 1970s that it was only after twenty-four weeks gestation that an unborn child was sufficiently developed to be safely delivered and "potentially able to live outside the mother's womb, albeit with artificial aid." *Roe*, 410 U. S. at 160.  Prior to that point of gestation, medical science had not progressed to where it was possible to both terminate a woman's pregnancy via delivery and sustain the life of the child.  As predicted by Justice O'Connor, the gestational age at which viability occurs is steadily being reduced.  *See Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 456-57 (1983); *see also Planned Parenthood of Se.* and *Casey*, 505 U.S. 833, 860 (1992).

18.     In the decades since *Roe*, the Court has consistently described the putative "right to abortion" as a "right [now, interest] to terminate a pregnancy" *prior to viability*.  Absent a threat to a mother's life or a serious risk of substantial and irreversible impairment of a major bodily function, nothing in the Court's jurisprudence confers upon any person a right to kill a viable unborn child.

19.     New York has legislatively authorized killing *viable* unborn children based on a "right"

that finds no warrant in *Roe* or its progeny.

20.     Recent advances in medical understanding have significantly enhanced our understanding of fetal development and have established that unborn children are capable of surviving outside the mother's womb as early as 21-22 weeks gestation.  The medical definition of "viability" is no longer at the 24-week gestation mark.

21.     Medical knowledge of viability has so far changed since *Roe v. Wade* in 1973 "as to render its [] holding unjustifiable in dealing with the issue addressed." *Cf. Casey*, at 855. Modern recognition of the dangers arising from the exclusion of any human beings from legal protections afforded "persons" weighs heavily in favor of a broader, more inclusive understanding of who fits within the category of legal persons.  Moreover, evolving societal and medical notions of what constitutes liberty compel an enhanced understanding of substantive due process and equal protection principles for viable unborn children under the Fourteenth Amendment.  The Fourteenth Amendment's guarantees were drafted to remedy the historic injustice of excluding an entire category of human beings from the protection of the law. Current medical knowledge regarding the humanity of viable unborn children requires their inclusion in those guarantees as well.

22.     Plaintiffs urge this Court to recognize that certain provisions of the RHA fail to comply with basic constitutional requirements, absent proper judicial construction: N.Y. Public Health Law §2599-BB.1 requires a narrow and constitutionally consistent definition of the RHA's ambiguous reference to "healthcare provider" and "health," as well as the elimination of the statutory presumption of viability at twenty-four weeks gestation.

23.     Plaintiffs further urge this Court to recognize that N.Y. Penal Law §125.05 requires a definition of "person" that is consistent with medical reality and the constitutional guarantees of

due process and equal protection. As currently interpreted by Defendants, the statute violates the substantive due process rights of pregnant women, newborn children, and viable unborn children, and it denies viable unborn children equal protection under the law without justification or legitimate state purpose.

24.    Plaintiffs also ask this Court to declare that Section 125.05 violates the First Amendment, as made applicable to the states through the Fourteenth Amendment, of pregnant women, viable unborn children, and children surviving attempted abortions by denying their right to redress of grievances arising from the killing of unborn and newborn children.

25.    Further, Plaintiffs ask this Court to declare that N.Y. Penal Law §125.05 violates the First Amendment, as made applicable to the states through the Fourteenth Amendment, by denying pregnant women, their newborn children, and viable unborn children, their right to redress of grievances arising from the killing of unborn and newborn children.

26.    Plaintiffs ask this Court to declare two provisions of Public Health Law §2599-BB.1 unconstitutionally vague. The absence of statutory definitions of "health" and "health care practitioner" in the statute fail to afford an ordinary person fair notice of the conduct deemed illegal and threatens arbitrary enforcement due to the absence of articulable standards.

27.    N.Y. Penal Law §125.05 and N.Y. Public Health Law § 2599-BB represent state-created dangers to pregnant women, unborn viable children, and children surviving attempted abortions. The New York legislature cast a "mantle of government authority" around those who kill unborn viable children, regardless of the woman's consent or resistance. *See National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988). Plaintiffs, who represent just some of the victims of these statutory changes and ambiguities, seek legal redress from this Court.

## PARTIES

### Plaintiffs

28.     Plaintiff JANE SMITH is an adult who resides in the Greater New York City area, in the State of New York.  In late 2019, she was in the early stages of pregnancy with her third child when she experienced intimate partner violence.  Plaintiff Jane Smith seeks to assert her own claims against Defendants, as well as those on behalf of two classes of women: (1) women who are subjected to a greater risk of violence as a result of the RHA's repeal and amendment of the N.Y. Penal Law §125.00, 125.40 and 125.45 ("Violence Against Women Class"); and (2) women who have experienced the murder or attempted murder of their viable unborn child and now have no legal recourse or redress for that crime as a result of the passage of the RHA's repeal and amendment of the N.Y. Penal Law §125.00, 125.40 and 125.45  ("Women Lacking Recourse Class"), both of which are described in more detail *infra*.

29.     Plaintiff JILL PARK is an adult who resides in the Western New York area, in the State of New York.  In late 2019 and early 2020, she was pregnant with her first child when she experienced intimate partner violence and threats from her partner's family.  Plaintiff Jill Park seeks to assert her own claims against Defendants, as well as those on behalf of two Classes of women: (1) Violence Against Women Class" and (2) the "Women Lacking Recourse Class," both of which are described in more detail *infra*.

30.     Plaintiff MARY DOE, an adult who resides in Madison County, New York, seeks to be appointed as a legal representative, guardian ad litem, or next friend, pursuant to Federal Rules of Civil Procedure Rule 17(c)(2), for the limited purposes of representing in this action viable unborn children who are (1) subject to being aborted due to Public Health Law §2599-BB.1; or (2) who are wanted, but killed at the hands of a harm-causing individual and have no right to

redress for their murder (collectively, the "Viable Unborn Children Class")  as a result of the modification of Penal Law §125 by the RHA, described in more detail *infra*.

31.     Plaintiff ANN JONES, an adult who resides in East Rochester, New York, seeks to be appointed as a legal representative, guardian ad litem, or next friend, pursuant to Federal Rules of Civil Procedure Rule 17(c)(2), for the limited purposes of representing in this action children who survive abortion ("Abortion Survivors Class").  Children who survive abortions are infant members of the species homo sapiens who are expelled or extracted from the body of his or her mother as the result of an attempt to abort the child, and who after such expulsion or extraction breathes or has a beating heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, regardless of whether the umbilical cord has been cut.  *See* 1 U.S.C §8 and N.Y. Public. Health Law §201.01(a).

32.     Plaintiff Dr. AMY MOE is a physician licensed since 1989 to practice medicine in the State of New York.  She is board certified in Family Medicine, with admitting privileges at Lewis County General Hospital since 1989.  She regularly cares for women at all stages of pregnancy and consults with both fathers and mothers regarding pregnancy decisions.  She also cares for women who have had abortions.  Dr. Moe sets forth her own claims, and also seeks to represent similarly situated physicians in this action (the "Physician Class") who are unable to fulfill their legal and professional obligation to inform and counsel pregnant patients regarding what medical circumstances allow post-viability abortions, and what healthcare professionals are authorized to provide such abortions.

**Defendants**

33.     Defendant Governor ANDREW CUOMO is the duly elected Governor of the State of New York and, at all times relevant to the Complaint, was acting under color of state law.  He is

sued in his official capacity. His principle place of business is NYS State Capitol Building, Albany, New York 12224. His executive authority is both effectuated by and limited by Article IV of the New York State Constitution.

34.     Defendant LETITIA JAMES is the Attorney General of New York State. She is sued in her official capacity. The Attorney General is required to "[p]rosecute and defend all actions and proceedings in which the state is interested and have charge and control of all the legal business of the departments and bureaus of the state." N.Y. Exec. Law § 63(1). The Attorney General therefore, has the authority and duty to enforce the RHA. Her principle place of business is New York State Office of the Attorney General, 28 Liberty Street, New York, NY 10005.

35.     Defendant HOWARD A. ZUCKER, M.D., J.D. is Commissioner of Health for New York State, and at all times relevant to the Complaint, was acting under color of state law. The New York Health Department is the state department charged with promotion and provision of diagnostic and therapeutic services for maternal and child health, communicable disease, medical rehabilitation, cancer and other conditions and diseases affecting public health; licensing, supervising and regulating maternity hospitals and homes and the occupation of midwifery; and maintaining and operating such state hospitals, institutions, public health centers and clinics as shall be established in the department. N.Y. Public Health Law § 201. He is sued in his official capacity. His principle place of business is New York State Department of Health, Corning Tower, Empire State Plaza, Albany, NY 12237.

36.     Defendant DEIRDRE ASTIN is Deputy Director, Division of Hospitals and Diagnostic and Treatment Centers, New York State Department of Health, and at all times relevant to the Complaint, was acting under color of law.   The Division of Hospitals and Diagnostic and Treatment Centers (D&TCs) is a division of the New York Health Department, and under the

statutory authority of Article 28, Section 3401 of the Public Health Law (PHL), and Title 10 of the New York Codes of Rules and Regulations (NYCRR), Section 405. In this capacity, the Division is charged with the regulatory oversight of all hospitals and their off-campus sites (hospital extension clinics). The Division is also responsible for oversight of freestanding clinics, known as diagnostic and treatment centers (D&TCs). After the passage of the RHA, this defendant has permitted non-hospital facilities and non-physician providers to perform abortions, including those performed on unborn children attaining viability prior to twenty-four weeks gestation, without promulgating any regulations for said practice, thereby increasing the medical risks to pregnant women and viable fetuses. Her failure to limit such practices to previability abortions, or when necessary to save the physical health or life of the woman, has caused the wrongful loss of human lives resulting from pre- and post-24 week abortions. She is sued in her official capacity. Her principle place of business is located at Corning Tower, Empire State Plaza, Albany, NY 12237.

37.    Defendant Deputy Commissioner SARAH BENSON directs the Office of Professional Discipline, and at all times relevant to the Complaint, was acting under color of law. After the passage of the RHA, Deputy Commissioner Benson failed to identify who is a "health care practitioner licensed, certified or authorized under title eight of the education law," or otherwise offer clarity with respect to the RHA. She is sued in her official capacity. Her principle place of business is New York State Department of Education Office of Professional Discipline, 1411 Broadway, Tenth Floor, New York, NY 10018.

38.    Defendant ARTHUR S. HENGERER, M.D. is Chair, New York State Department of Health Office of Professional Medical Conduct, and, at all times relevant to the Complaint, was acting under color of state law. As Chair of the New York State Department of Health Office of

Professional Medical Conduct, Defendant Hengerer is responsible for oversight of the continuing licensure and disciplinary activities relating to physicians licensed to practice medicine in New York State. These activities include medical case / patient care reviews, hearing and investigation of disciplinary complaints brought by patients and employers, and the making of determinations concerning the exercise of professional medical judgments, including those required to be made by physicians under the RHA. He is sued in his official capacity. His principle place of business is Office of Professional Medical Conduct, New York State Department of Health, Riverview Center, 150 Broadway, Suite 355, Albany, NY 12204-2719.

39.    Defendant DONNA FRESCATORE serves as the New York Medicaid Director, and at all times relevant to the Complaint, was acting under color of law. The Director oversees the department that has inexplicably re-defined "medically necessary abortions" as "procedures, either medical or surgical, that result in the termination of pregnancy," thus causing further confusion and alarm over the appropriate scope of health exceptions to abortions. She is sued in her official capacity. Her principle place of business is Department of Health, Empire State Plaza, Corning Tower, Room 1466, Albany, NY 12236.

40.    Defendant SHEILA J. POOLE is the Commissioner of the New York State Office of Children and Family Services (OCFS), a position created pursuant to N.Y.S. Executive Law §500 and the N.Y.S. Social Services Law. At all times relevant to the complaint Defendant Poole was acting under color of law. As Commissioner of OCFS, Ms. Poole is responsible for maintaining, regulating and supervising the state's domestic violence protection programs, expending $184,458,920.00 in FY2019 in furtherance of the goals of ensuring the safety of women victimized by intimate partner violence. Since the decriminalization of the killing of a viable unborn child pursuant to amendments to N.Y. Penal Law § 125.05 by the RHA, Defendant

Poole has failed to promulgate new guidelines for the handling of issues involving intimate partner violence against pregnant women. Specifically, Defendant has failed to promulgate new guidelines for domestic violence residential and non-residential shelter programs concerning how to increase premises security, protect those women who are pregnant and at increased risk for assault given the repeal of the fetal homicide laws, and counsel pregnant women seeking domestic violence assistance whose partners are attempting to force them to have an abortion. She has also failed to track increased harm to pregnant women or otherwise develop and promulgate statistics relating to women who are pregnant and are harmed. She is sued in her official capacity. Defendant Poole's principal place of business is at Capital View Office Park, 52 Washington Street, Rensselaer, New York 12144.

## JURISDICTION AND VENUE

41.    Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction over the claims asserted in this action because the action involves claims based on the First and Fourteenth Amendments to the United States Constitution (U.S. Const. Amends. I, XIV), and by 28 U.S.C. § 1343 because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution.

42.    The jurisdiction of this Court over the claims arising under 42 U.S.C. § 1983 is founded on 28 U.S.C. § 1343(3) and (4). The jurisdiction of the Court over the claims arising under the First and Fourteenth Amendments is founded on 28 U.S.C. §§ 1331 and 1343(3).

43.    There is an actual controversy between Plaintiffs and Defendants.

44.    The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recover damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. § 1651(a)

(injunctive relief), 28 U.S.C. §§ 2201 and 2202 (declaratory and other appropriate relief), 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), 42 U.S.C. § 1988 (award of attorneys' fees and costs).

45.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e)(1) as most of the parties reside in this District and because the State legislative and regulatory actions at issue occurred within this District.

46.    The State has waived qualified immunity from suit insofar as it has made a general written waiver in Court of Claims Act §8, and has previously consented to federal jurisdiction before this Court in constitutional claims surrounding matters of public health, the regulation of the medical profession and the delivery of reproductive health care, *e.g., Lange-Kessler v. Dept. of Education*, 109 F.3d 137 (2d Cir. 1997). Moreover, immunity does not apply to individually- named defendants in their official capacities.

## LEGAL CHANGES DUE TO PASSAGE OF THE REPRODUCTIVE HEALTH ACT

47.    On or about January 22, 2019 the Legislature of the State of New York passed and the Governor of New York State signed into law the "Reproductive Health Act" ("RHA"), creating what it called "a fundamental right" to abortion. The Act added, amended, and repealed multiple provisions of New York law regarding public health, education, and criminal conduct. *See* Exhibit A.

48.    The RHA added a new article, Art. 25–A, to the Public Health Code. The article provides as follows:

N.Y. Public Health Law § 2599–AA Policy and purpose.

The legislature finds that comprehensive reproductive health care is a fundamental component of every individual's health, privacy and equality. Therefore, it is the

policy of the state that:

1. Every individual has the fundamental right to choose or refuse contraception or sterilization.

2. Every individual who becomes pregnant has the fundamental right to choose to carry the pregnancy to term, to give birth to a child, or to have an abortion, pursuant to this article.

3. The state shall not discriminate against, deny, or interfere with the exercise of the rights set forth in this section in the regulation or provision of benefits, facilities, services or information.

N.Y. Public Health Law § 2599–BB. Abortion

1.   A health care practitioner licensed, certified, or authorized under title eight of the education law, acting within his or her lawful scope of practice, may perform an abortion when, according to the practitioner's reasonable and good faith professional judgment based on the facts of the patient's case: the patient is within twenty-four weeks from the commencement of pregnancy, or there is an absence of fetal viability, or the abortion is necessary to protect the patient's life or health.

2.   This article shall be construed and applied consistent with and subject to applicable laws and applicable and authorized regulations governing health care procedures.

N.Y. Legis. 1 (2019), 2019 Sess. Law News of N.Y. Ch. 1 (S. 240).

49.    The RHA repealed N.Y. Public Health Law § 4164 which provided:

1.   When an abortion is to be performed after the twelfth week of pregnancy it shall be performed only in a hospital and only on an in-patient basis.  When an abortion is to be performed after the twentieth week of pregnancy, a physician other than the physician performing the abortion shall be in attendance to take control of and to provide immediate medical care for any live birth that is the result of the abortion. The commissioner of health is authorized to promulgate rules and regulations to insure the health and safety of the mother and the viable child, in such instances.

2.   Such child shall be accorded immediate legal protection under the laws of the state of New York, including but not limited to applicable provisions of the social services law, article five of the civil rights law and the penal law.

3.   The medical records of all life-sustaining efforts put forth for such a live aborted birth, their failure or success, shall be kept by attending physician.  All

other vital statistics requirements in the public health law shall be complied with in regard to such aborted child.

4.  In the event of the subsequent death of the aborted child, the disposal of the dead body shall be in accordance with the requirements of this chapter.

N.Y. Public Health Law § 4164.

50.    The RHA eliminated the crimes of abortion in the first degree and self-abortion in the first degree by redefining the definition of "person" thus narrowing the definition of homicide by excluding conduct that causes the death of "an unborn child with which a female has been pregnant for more than twenty-four weeks." N.Y. Penal Law § 125.00.

51.    Section 125.05 of the N.Y. Penal Law was amended to simply state: "The following definition is applicable to this article: 'Person,' when referring to the victim of a homicide, means a human being who has been born and is alive."

52.    The RHA deleted subsections in N.Y. Penal Law § 125.05 defining "abortional act" and "justifiable abortional act." These terms had been defined as:

125.05.2.  "Abortional act" means an act committed upon or with respect to a female, whether by another person or by the female herself, whether she is pregnant or not, whether directly upon her body or by the administering, taking or prescription of drugs or in any other manner, with intent to cause a miscarriage of such female.

125.05.3.  "Justifiable abortional act." An abortional act is justifiable when committed upon a female with her consent by a duly licensed physician acting (a) under a reasonable belief that such is necessary to preserve her life, or, (b) within twenty-four weeks from the commencement of her pregnancy. A pregnant female's commission of an abortional act upon herself is justifiable when she acts upon the advice of a duly licensed physician (1) that such act is necessary to preserve her life, or, (2) within twenty-four weeks from the commencement of her pregnancy.

The submission by a female to an abortional act is justifiable when she believes that it is being committed by a duly licensed physician, acting under a reasonable belief that such act is necessary to preserve her life, or, within twenty-four weeks from the commencement of her pregnancy.

53.    N.Y. Penal Law § 125.15 defining manslaughter in the second degree was amended to

delete commission of "an abortional act which causes [the woman's] death, unless such abortional act is justifiable pursuant to subdivision three of section 125.05."

54.    Similarly, N.Y. Penal Law § 125.20 defining manslaughter in the first degree was amended to delete commission of an act "upon a female pregnant for more than twenty-four weeks an abortional act which causes her death, unless such abortional act is justifiable pursuant to subdivision three of section 125.05."

55.    The RHA also repealed N.Y. Penal Law § 125.40 defining abortion in the second  degree. Abortion in the second degree had been defined as "commit[ting] an abortional act upon a female, unless such abortional act is justifiable pursuant to subdivision three of section 125.05." Abortion in the second degree was a Class E felony.

56.    The RHA repealed N.Y. Penal Law § 125.45 defining abortion in the first degree. Abortion in the first degree occurred when a person "commit[ted] upon a female pregnant for more than twenty-four weeks an abortional act which causes the miscarriage of such female, unless such abortional act is justifiable pursuant to subdivision three of section 125.05." Abortion in the first degree is a Class D felony.

57.    The RHA repealed N.Y. Penal Law § 125.50 defining self-abortion in the second degree, as well as § 125.60 defining the crime of issuing abortional articles.

58.    Prior to the enactment of the RHA, a criminal assailant could be charged with the murder of an unborn child with whom a woman had been pregnant for more than twenty-four weeks.

59.    After the passage of the RHA, there is no longer any criminal penalty for the murder of a viable unborn child by a criminal assailant.

60.    The RHA repealed N.Y. Education Law § 6811(8) prohibiting the sale or distribution of any contraceptive device or medication to a minor under the age of sixteen years and limiting the

sale of such devices and medication to adults to licensed pharmacists.

61.    The RHA also deleted reference to these crimes in other statutes since the crimes no longer exist in the Penal Code.

62.    Prior to the passage of the RHA, abortions were only available after twenty-four weeks gestation if necessary to protect the life of the woman. N.Y. Penal Code § 125.05(c) (defining "justified abortional act").

63.    After passage of the RHA, a post-twenty-four-week abortion may be performed if the "health care practitioner" determines that 1) there is an absence of fetal viability, or 2) the abortion is necessary to protect the woman's life, or 3) the abortion is necessary to protect the woman's health. N.Y. Public Health § 2599–BB.1.

64.    The RHA provides no enforcement mechanism for enforcing the prohibition of performing an abortion after twenty-four (24) weeks when the abortion is not necessary to protect the life or health of the woman.

65.    Prior to implementation of the RHA, abortions could only legally be performed by a duly licensed physician. N.Y. Penal Code § 125.05.3.

66.    After implementation of the RHA, any "health care practitioner licensed, certified, or authorized under title eight of the education law, acting within his or her lawful scope of practice" may legally perform abortions.  N.Y. Public Health § 2599–BB.1.


## CLASS ACTION ALLEGATIONS

67.    Plaintiffs SMITH, PARK, and Dr. MOE bring this action on their own behalf and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons who are or will be similarly situated.  Plaintiffs DOE and JONES, as next friend bring this action pursuant to

Rule 23 of the Federal Rules of Civil Procedure on behalf of viable unborn children and children surviving attempted abortions.

## Violence Against Women Class

68.    Plaintiffs Smith and Park bring this action on their own behalf and also on behalf of the Violence Against Women Class, which is comprised of women who are or may become pregnant and who are subjected to a greater risk of violence as a result of N.Y. Penal Law §125.05. This claim is based on Defendants' redefinition of the term "person" for purposes of homicide in the penal code, thereby decriminalizing the killing of a child in *utero* by any third party, even when the mother intends to bring the child to term.  Defendants have enhanced the risk of harm to pregnant women and their viable unborn children by eliminating punitive sanctions and their deterrent effect for post-viability fetal homicide.

## Women Lacking Recourse Class

69.    Plaintiffs Smith and Park bring this action on their own behalf and also on behalf of the Women Lacking Recourse Class, comprised of all women who have been subjected to violence that has caused the death or potential or attempted death of their unborn children and have been or may be deprived of a judicial remedy for their loss by N.Y. Penal Law §125.05, including by dismissal of pending criminal actions or post-conviction relief resulting in vacatur of convictions and/or release from incarceration because of the RHA's legalization of feticide.

70.    Plaintiffs Smith and Park are appropriate Class representatives for both the Violence Against Women and the Women Lacking Recourse Classes.

71.    Plaintiff Smith has experienced intimate partner violence while pregnant.  At various times during late 2019, Plaintiff Smith's partner physically assaulted her, dragged her on the

floor, exposed her while she was undressed, pulled her out of the bed, threw her belongings across the room, threatened her, encouraged her to consider aborting their unborn child, threatened her with violence from others while pregnant by constantly warning her that she may encounter a group of women on the street whose intent would be to harm her, all of which caused Plaintiff Smith to fear for her safety and that of her unborn baby.

72.    The violence escalated on the day of her first sonogram.  In November 2019, Plaintiff Smith's partner refused to accompany her to the appointment, threw urine at her from a bottle, locked her out of the house, and told her to leave the premises.  Plaintiff Smith, fearing for her life and the safety of her unborn child, fled her home and sought refuge first in a motel, then in a domestic violence shelter located in Long Island after initiation of NY Pause (New York's stay at home order issued in response to the COVID-19 pandemic).

73.    On June 2, 2020, Plaintiff Jane Smith gave birth to a male child.

74.    Plaintiff Jane Smith and her newborn son currently live in a residential home for pregnant and expectant mothers in the Greater New York City area.

75.    Plaintiff Jane Smith is also a survivor of intimate partner violence in connection with her first two pregnancies.  In 2002, while pregnant with her daughter, Plaintiff Smith's then-husband violently assaulted her. He twisted her arms behind her back, tried to break her fingers, threw objects at her, dragged her by the hair, and flung her across the room.

76.    Plaintiff Smith fled to England, where her daughter was born.

77.    Plaintiff Smith reconciled with her husband when their daughter was eighteen months old and returned to the United States.

78.    The abuse resumed, and Plaintiff Smith obtained an order of protection against her husband and his father.

79.    In November 2005, while eight months pregnant with her second child, her then-husband threw an armchair at her head, striking her, and repeatedly threatened or assaulted her.  Plaintiff Smith was able to shield her unborn baby from the armchair.

80.    Had Plaintiff Jane Smith's unborn children died during any of the violent assaults in 2002 or 2005, her then-husband could have been charged with multiple felony counts, including abortion in the first degree (PL 125.45), abortion in the second degree (PL §125.40), and homicide in connection with the death of the unborn baby.

81.    Had Plaintiff Jane Smith's 2019 pregnancy resulted in the loss of her unborn child as a result of violence, however, there would be no felony or homicide counts for the loss of her unborn child, M.R.  The laws under which her first husband potentially could have been charged were repealed by the RHA.

82.    Plaintiff Jane Smith is of childbearing age and is capable of a future pregnancy.

83.    Plaintiff Jane Smith is capable of representing other women who have faced abuse and may become pregnant in the future, including all women who fall within the Violence Against Women and Women Lacking Recourse Classes.

84.    Plaintiff Smith has reason to believe that those who have committed violence against her in the past, and her potential future partners, are aware of the significant and alarming change in New York law with respect to deadly violence against unborn children.

85.    In late 2019 and early 2020, Plaintiff Jill Park was pregnant with her first child when she experienced domestic violence from her partner.

86.    At various times during 2020, he verbally or physically assaulted Plaintiff Park, and threatened her.  Once, while she was pregnant, her partner took out a knife and stabbed the mattress of the bed upon which she was sitting.

87.    He threatened to kill her while she was pregnant.

88.    The extended family of Plaintiff Park's partner also made threats towards her while she was pregnant. They harassed her online, verbally abused her, and made specific threats to physically assault her.

89.    One extended family member struck her and verbally abused her.  The assailant told Plaintiff Park that she was not fit to be a mother and that people wanted to harm her.

90.    Plaintiff Park's partner, through his actions or inactions, potentially exposed her to violence from others while pregnant.  His conduct, as well as his family's actions, caused her to fear for her safety, both when she was pregnant, and now that the baby is born.

91.    On April 29, 2020, Plaintiff Park prematurely gave birth to a female child.  The stress of the violence and threats contributed to her premature delivery.  Plaintiff Park's child has special needs as a result of the premature birth and subsequent complications.

92.    After the birth of Plaintiff Park's child, her former partner threatened to kill himself, Plaintiff Park, and the baby.  He acted in an abusive way towards the baby, and is currently subject to a protective order prohibiting him from being around both the baby and Plaintiff Park.

93.    Plaintiff Park sought refuge in a domestic violence shelter in Buffalo, New York.

94.    After moving to the shelter, Plaintiff Park met with her former partner at a separate location to lend him some items.  He became violent, ripped her belongings, gave her a concussion, and stole her cellphone.

95.    Plaintiff Park obtained an order of protection.

96.    If her unborn child had died during any of the assaults, she experienced in 2019 or 2020, her partner would not have been charged with the death of that unborn child.  The laws under which her partner could have been charged were repealed or changed by the RHA.

97.    Plaintiff Park is of childbearing age and is capable of a future pregnancy.

98.    Plaintiff Park is capable of representing other women who have faced abuse and are pregnant or may become pregnant in the future.

99.    The changes brought about by the RHA have subjected Plaintiff Park and others like her to an increased risk of violence because there are no repercussions for a deadly assault upon an unborn child, and little to deter a violent person from attempting to kill an unborn baby.

100.    She believes that her future children and herself, as well as other women of child-bearing age, face an increased threat from harm-causing individuals as a result of the RHA. Her participation in this litigation is therefore important to her and others like her.

101.    Plaintiffs Smith and Park, and their respective future children, as well the Violence Against Women and Women Lacking Recourse Class members, face an increased threat from harm-causing individuals as a result of N.Y. Penal Law §125.05.

102.    The changes in New York Penal law brought about by the RHA have thereby caused irreparable harm to Plaintiffs Smith and Park, and to the Violence Against Women and Women Lacking Recourse Class members.

103.    New York Penal Law §125.05 infringes Plaintiffs' constitutional rights to redress and equal protection for harms or potential harms to them and their unborn children.

104.    The questions of law and fact presented by the named Plaintiffs are common to other members of the defined Classes. Each Class member's claim raises the same basic questions:

1. Whether, in the case of the Violence Against Women Class, the enactment of the RHA has irrationally, invidiously and in violation of the Fourteenth Amendment, deprived Class members of their right to substantive due process by legalizing and thus incentivizing violence against them deliberately directed

to the killing of their unborn children, thereby ending, without any legitimate state purpose, nearly two centuries of the protection of women against such violence.

2. Whether, in the case of the Women Lacking Recourse Class, the enactment of the RHA has irrationally, invidiously and in violation of the First Amendment, deprived Class members of their right to access the courts for redress of grievances by legalizing and thus incentivizing violence against them deliberately directed to the killing of their unborn children, thereby ending, without any legitimate state purpose, the right of women to seek justice and obtain redress for the death or attempted murder of their viable unborn children.

105.    Plaintiffs Smith and Park's claims, and those of the Violence Against Women and Women Lacking Recourse Classes, arise out of the same type of event or conduct – a violent assault upon a pregnant woman – and will not depend upon the degree or dollar value of harm, injury, or damages.

106.    Plaintiffs Smith and Park are fully ready, willing, and able to represent the interests of the Violence Against Women and Women Lacking Recourse Classes.

**Viable Unborn Children Class**

107.    Plaintiff Doe seeks to represent the Viable Unborn Children Class, a Class of persons with existing, but heretofore unrecognized, rights who are seeking injunctive and declaratory relief based on the Defendants' actions. The Class is collectively defined as follows: Viable unborn children who are (1) subject to being aborted due to the passage of the RHA; or (2) who are killed or nearly killed at the hands of a harm-causing individual and who have no right to redress for their murder or attempted murder as a result of the RHA's repeal and amendment of

the Penal Law §§ 125.00, 125.05, 125.40, 125.45, and related provisions of N.Y. Penal Law.

108.    Federal Rule of Civil Procedure 17(c)(2) has been extended to permit a court to appoint a guardian *ad litem*, or next friend, to represent the interests of unborn children where such appointment is necessary to protect the children's interests. *E.g. Hatch v. Riggs Nat'l Bank*, 361 F.2d 559 (D.C. Cir. 1966) (appointment of guardian *ad litem* to represent interests of unborn to consent to modification or revocation of a trust is proper). The appointment of a guardian *ad litem* is particularly suitable in this case where "the independent existence of the [viable unborn child's] life can in reason and all fairness be the object of state protection." *Cf. Casey*, 505 U.S. at 870.

110.    The Second Circuit has recognized the propriety of appointing a legal representative other than a parent when the interests of the parent and child diverge. *Ad Hoc Comm. of Concerned Teachers v. Greenburgh # 11 Union Free Sch. Dist.*, 873 F.2d 25, 30-31 (2d Cir.1989) (quoting *Child v. Beame*, 412 F.Supp. 593, 599 (S.D.N.Y.1976); *see also Developmental Disabilities Advocacy Center, Inc. v. Melton,* 689 F.2d 281, 285 (1st Cir.1982); *Adelman on behalf of Adelman v. Graves,* 747 F.2d 986 (5th Cir.1984) (even when party is already represented, court has power to appoint guardian *ad litem* when interests of general representative are in conflict with those of person represented); *Noe v. True,* 507 F.2d 9 (6th Cir.1974) (trial court should have considered and ruled on motion by attorney for 14–year–old that he be appointed her guardian *ad litem* in suit challenging state abortion law where her legal guardian was a defendant).

110.    The interests of the Viable Unborn Children Class are adverse to those of their mothers because their mothers have chosen to terminate, or may terminate, the children's lives through abortion pursuant to the expanded and unconstitutional grounds contained in the RHA.

Moreover, the interests of the Viable Unborn Children Class are adverse to or differ from those of their mothers who are being coerced to abort the child through intimate partner violence ("IPV"), or undue pressure, or who are otherwise unable to speak on behalf of their unborn children.

111.    Plaintiff Doe has no interests adverse to the rights of these unborn children and is fully competent and responsible to prosecute the proposed action as "next friend" for the Viable Unborn Children Class.

112.    Plaintiff Doe has experience that is directly relevant to the myriad of issues that impact the life of an unborn child subject to abortion pursuant to the RHA or who has been murdered, or attempted to be murdered, particularly where the unborn child's mother is experiencing IPV, uncertainty about her ability to continue the pregnancy, or threats to the unborn child from a partner.

113.    Plaintiff Doe holds a Bachelor of Science degree in Psychology and has pursued additional training related to domestic violence and other relevant issues.

114.    Plaintiff Doe is the director and co-founder of an organization that trains people to provide counseling and consulting services to men and women who are considering abortion. That organization is not a party to this litigation.

115.    Plaintiff Doe is also associated with an organization that provides medical care, including ultrasounds and pregnancy tests, to women who are or may be pregnant. That organization is not a party to this litigation.

116.    For over twenty years, Plaintiff Doe has worked on the streets of the Bronx, New York, and Syracuse, New York, talking with women who have had abortions or men and women who are considering an abortion.

117.    Plaintiff Doe has counseled thousands of pregnant women in crisis, many of whom have experienced abuse at the hands of an intimate partner and who feared for both their lives and those of their unborn children.

118.    Plaintiff Doe is capable of representing the interests of the Viable Unborn Children Class.

119.    Plaintiff Doe is fully willing to represent the interests of the Viable Unborn Children Class.

120.    The interests of the Viable Unborn Children Class are appropriate for resolution pursuant to a class action because the jeopardy to their lives arises out of the same event or conduct: an individual attempts to terminate their lives either through criminal activity or through the authority improperly granted under the RHA.

121.    The members of the Viable Unborn Children Class have suffered specific and perceptible harm to fundamental rights grounded in the United States Constitution, and that harm is capable of resolution and redress in the federal courts.

122.    Specifically, the RHA violates the substantive due process rights of the Viable Unborn Children Class by permitting their destruction for any reason and on demand up to twenty-four weeks gestation, or, after twenty-four weeks gestation, for broad health reasons or any reason beyond serious physical health.

123.    Moreover, the members of the Viable Unborn Children Class face an increased risk of violence, including injury and death, from harm-causing individuals as a result of the RHA.  By redefining the term "person" to include only those human beings who have been born and are alive, the State has abandoned its effort to deter such harmful conduct towards pregnant women, thus putting unborn children at an increased risk of criminal acts of violence, including lethal violence.

124.    Finally, by decriminalizing the killing of a viable unborn child, the State has ignored or

completely abandoned responsibilities arising from the state's interest in the lives of the Viable Unborn Children Class.

125.    The members of the Viable Unborn Children Class are being deprived of their Constitutional rights to life, liberty, due process and equal protection under the law.

126.    The questions of law and fact presented by Plaintiff Doe on behalf of the members of the Viable Unborn Children Class are common among all members of the defined Class. Each Class member's claim raises the same basic questions:

1. Whether, in the case of the Viable Unborn Children Class, the redefinition of "person" and decriminalization of killing viable unborn children has irrationally, invidiously and in violation of the Fourteenth Amendment's equal protection and due process protections, deprived Class members of their right to not be deprived of life without due process by;

2. Authorizing the on-demand killing of a Viable Unborn Child Class member up to 24 weeks gestation while affording minimal protections of viable unborn children after 24 weeks gestation;

3. Authorizing the killing of a viable unborn child of any gestational age -- indeed up until moments before birth -- for reasons other than the killing is necessary to preserve the life of the mother or to avoid the risk of a serious and permanent impairment of a major bodily function of the mother;

4. Denying legal redress for the killing or attempted killing of a member of the Viable Unborn Child Class member;

5. Redefining "person" to exclude the Viable Unborn Child Class members thereby eliminating punitive consequences or a right to redress for their death;

and

6. Ignoring New York's interests in the life and development of a viable preborn child, and its interests in preserving the life and health of the mother during postviability abortions.

127.    The changes brought about by the RHA have caused irreparable harm to the Viable Unborn Children Class.

128.    The Viable Unborn Children Class members are in need of a next friend to vindicate those rights.

129.    Plaintiff MARY DOE is appropriately positioned to act as the next friend for the Viable Unborn Children Class.

**Abortion Survivors Class**

130.    Plaintiff ANN JONES seeks to represent the Abortion Survivors Class, a Class of persons whose rights have been infringed with the passage of the RHA and as a result of the Defendants' actions.  The Class is collectively defined as follows: children who reach the twentieth week  of gestation and   survive an attempted abortion, and who, as a result of removing the prior requirement of N.Y. Public Health Law § 4164 that a second physician be present for abortions performed after the twentieth week of pregnancy, are deprived of the necessary medical care from a second physician present and dedicated to care for the infant born alive during the attempt to perform a late-term abortion

131.    The Second Circuit has recognized the propriety of appointing a legal representative other than a parent when the interests of the parent and child diverge.  *Ad Hoc Comm. of Concerned Teachers v. Greenburgh # 11 Union Free Sch. Dist.*, 873 F.2d 25, 30-31 (2d Cir.1989) (quoting *Child v. Beame*, 412  F.Supp. 593, 599 (S.D.N.Y.1976); *see also Developmental*

*Disabilities Advocacy Center, Inc. v. Melton,* 689 F.2d 281, 285 (1st Cir.1982);  *Adelman on behalf of Adelman v. Graves,* 747 F.2d 986 (5th Cir.1984) (even when party is already represented, court has power to appoint guardian *ad litem* when interests of general representative are in conflict with those of person represented);  *Noe v. True,* 507 F.2d 9 (6th Cir.1974) (trial court should have considered and ruled on motion by attorney for 14–year–old that he be appointed her guardian *ad litem* in suit challenging state abortion law where her legal guardian was a defendant).

132.    The interests of the Abortion Survivors Class are adverse to those of their mothers because their mothers have chosen to terminate the children's lives through abortion pursuant to the expanded and unconstitutional grounds contained in the RHA.

133.    Plaintiff Jones has experience that is directly relevant to the myriad of issues that impact the life of an unborn child subject to abortion pursuant to the RHA, as well as a survivor of abortion.

134.    Plaintiff Jones is a social worker.  She holds a Bachelor of Social Work (BSW) degree and is working towards a master's degree in social work (MSW).  She is certified in Therapeutic Crisis Intervention (TCI).

135.    Plaintiff Jones currently works at a Rochester-area maternity home. The staff at the maternity home, including Plaintiff Jones, cares for pregnant and new mothers who are experiencing homelessness or unstable living conditions in the Rochester region.

136.    The maternity home residents generally are fleeing unsafe environments and/or threats towards themselves and/or their unborn baby.  The maternity home is not a party to this litigation.

137.    Plaintiff Jones provides support for both the new mothers and the unborn and born children

by providing mentoring, training, nurturing, resources, and stability, and by coordinating additional services that they might need.

138.   Plaintiff Jones has previously worked with emotionally disturbed children and their parents.

139.   Plaintiff Jones is capable of representing the interests of the Abortion Survivors Class.

140.   Plaintiff Jones is fully willing to represent the interests of the Abortion Survivors Class.

141.   Plaintiff Jones has no interests adverse to the rights of these children, is not connected in business with any of the adverse parties and is fully competent and responsible to prosecute the proposed action as "next friend" for the Abortion Survivors Class.

142.   The interests of the Abortion Survivors Class are appropriate for resolution pursuant to a Class action because the jeopardy to their lives arises out of the same event or conduct: they survive an attempted abortion after the twentieth week of pregnancy. As a result of the RHA and the Defendants' actions, these children are deprived of the benefit of a physician designated for their care.

143.   The members of the Abortion Survivors Class have suffered specific and perceptible harm to fundamental rights grounded in the United States Constitution, and that harm is capable of resolution and redress in the federal courts.

144.   Specifically, the RHA violates the substantive due process rights of the Abortion Survivors Class by depriving them of lifesaving medical care and allowing them to simply die, often in agony, in violation of their constitutional rights to life, liberty, and equal protection under the law.

145.   Moreover, by passing the RHA, the State has ignored or completely abandoned its responsibilities associated with the state interest in the lives of the Abortion Survivors Class

members.

146.   The questions of law and fact presented by Plaintiff Jones on behalf of the Abortion Survivors Class is common among all members of the defined Class. Each Class member's claim raises the same basic questions:

> Whether, in the case of the Abortion Survivors Class, the enactment of the RHA has irrationally, invidiously and in violation of the Fourteenth Amendment's equal protection and due process protections, deprived Class members of their right to not be deprived of life without due process by:
>
> 1. Depriving them of the benefit of a physician designated for their care; and
>
> 2. Ignoring New York's interests in the life, health, well-being, and development of an Abortion Survivors Class member.

147.   The changes brought about by the RHA have caused irreparable harm to the Abortion Survivors Class.

148.   The Abortion Survivors Class members are in need of a next friend to vindicate those rights.

149.   Plaintiff Jones is appropriately positioned to act as the next friend for the Abortion Survivors Class.

## Physician Class

150.   Plaintiff Dr. Amy Moe seeks to represent the Physician Class, a Class of medical doctors who are seeking injunctive and declaratory relief based on the Defendants' actions.   The Physician Class is collectively defined as follows: physicians who provide medical care or treat women at all stages of pregnancy, or who treat post-abortive women, or who regularly consult

with fathers or mothers regarding pregnancy decisions and reproductive health choices.

151.    Plaintiff Dr. Moe has no interests adverse to the rights of the Physician Class, and is fully competent and responsible to prosecute the proposed action as a class representative for the Physician Class.

152.    Plaintiff Dr. Moe has experience that is directly relevant to the myriad of issues that impact the Physician Class members.

153.    Dr. Moe is a physician licensed since 1989 to practice medicine in the State of New York. She has had admitting privileges at the same New York hospital since 1989.  She regularly treats women at all stages of pregnancy and consults with both fathers and mothers regarding pregnancy decisions.  She also treats women who have had abortions.

154.    Dr. Moe routinely responds to questions from her patients about pregnancy and pregnancy options, including the termination of a pregnancy.

155.    Dr. Moe is specifically asked questions by her patients that relate to the appropriate factors for the termination of a pregnancy, including questions relating to the time period within which an abortion would be permissible under New York law.

156.    Dr. Moe is unclear as to what the definition of "health" includes or when termination is "medically necessary to protect a patient's … health."

157.    The RHA lacks any objective criteria for determining when a post-twenty-four-week abortion to protect a woman's health is permitted.

158.    Dr. Moe is unable to fulfill her legal obligation to adequately inform and counsel her patients considering abortion because Public Health Law § 2599-BB.1 fails to give her fair notice of what abortions are prohibited after twenty-four weeks gestation.

159.    Moreover, since Public Health Law § 2599-BB.1 appears to allow health care

practitioners other than "duly licensed physicians" to perform non-surgical and surgical abortions, and to perform abortions (including third trimester abortions) in facilities other than hospitals, Dr. Moe and other members of the Physician Class are unable to fulfill their legal obligation to adequately inform and counsel patients considering the required qualifications or competency of any particular abortion provider or facility.

160.    Dr. Moe and other members of the Physician Class are also unable to fulfill their legal obligation to provide competent medical assessment and care for post-abortive women, particularly those seeking emergency care, because Public Health Law § 2599-BB.1 fails to give them fair notice of the minimum medical skills a "health care practitioner" must have to perform an abortion after twenty-four weeks gestation.

161.    The lack of clarity and vagueness in Public Health Law § 2599-BB.1 has impeded and will continue to impede Dr. Moe and the Physicians Class members' ability to appropriately answer patient questions, address patient concerns, or provide full and complete assessments on post-abortive women.

162.    Plaintiff Dr. Moe is capable of representing the interests of the Physician Class.

163.    Plaintiff Dr. Moe is fully willing to represent the interests of the Physician Class.

164.    The interests of the Physician Class are appropriate for resolution pursuant to a Class action because the claim arises out of the fact that two operative provisions of Public Health Law § 2599-BB.1 are so vague as to render them in need of reformation to provide "persons of ordinary intelligence a reasonable opportunity to know what is prohibited, so that they may act accordingly", to wit: (i) Public Health Law §2599-BB.1 fails to define which "healthcare practitioners" may perform abortions; and (ii) Public Health Law §2599-BB.1 fails to define the medical conditions that would make an abortion necessary for the "health" of the mother after

twenty-four weeks gestation.

165.    The members of the Physician Class are in need of clarity and that harm is capable of resolution and redress in the federal courts.

166.    The questions of law and fact presented by Plaintiff Dr. Moe on behalf of the members of the Physician Class are common among all members of the defined Class. Each Class member's claim raises the same basic questions:

> Whether, in the case of the Physician Class, Public Health Law §2599-BB.1 is unconstitutionally vague, failing to give persons of ordinary intelligence a reasonable opportunity to know:

> 1. which "healthcare practitioners" may perform abortions; and most particularly may perform post-viability abortions; and

> 2. what conditions legally justify the performance of an abortion at or after twenty-four weeks gestation as necessary for the "health" of the mother.

167.    Plaintiff Dr. Amy Moe is appropriately positioned to act as the Class representative for the Physician Class.

**FACTUAL ALLEGATIONS**

**History of New York Abortion Law and Rights of Viable Unborn Children Prior to Passage of the RHA**

168.    Abortion has been the subject of criminal law in New York since 1829. New York Revised Statutes of 1829 criminalized abortion of an "unborn quick child" (generally ten to

twelve weeks gestation) and specified such conduct to be second-degree manslaughter of "a human being." A stringent exception was made for abortions to preserve the mother's life, but only if two physicians testified that the abortion was necessary for that purpose.

169.    This language evincing fetal personhood remained in the New York statutes through the passage of the Fourteenth Amendment, through the 1970 amendments (discussed *infra*), and indeed, remained in New York Laws until the passage of the RHA in 2019.

170.    New York was one of the thirty states and six U.S. territories that criminalized abortion by 1868, the year the Fourteenth Amendment was adopted. *Roe v. Wade*, 410 U.S. 113, 176 n. 2 (Rehnquist, J. dissenting).

171.    In 1951, the New York Court of Appeals held that a fetus was independent of his or her mother and entitled to recover after birth for injuries sustained in the womb. *Woods v. Lancet*, 303 N.Y. 349, 357 (1951). As the New York State Court of Appeals opined: "To hold, as matter of law, that no viable fetus has any separate existence which the law will recognize is for the law to deny a simple and easily demonstrable fact." *Id.*

172.    Children in utero are recognized under the law of New York for inheritance purposes, and "no distinction between viability or non-viability was attempted to be drawn in determining the point of vestiture of a legal right." *Kelly v. Gregory*, 282 App. Div. 542, 125 N.Y.S.2d 696 (1953).

173.    In 1970, three years prior to *Roe v. Wade*, New York decreased its historical protection afforded unborn children at quickening by limiting such protection only to viable unborn children. The new law permitted a woman to terminate her pregnancy by abortion for any reason up through 24 weeks from the commencement of a woman's pregnancy. After twenty-four weeks from the commencement of a woman's pregnancy, terminating a pregnancy by

abortion was legal only if necessary to protect the life of the woman. N.Y. Penal Law § 125.05 (3), as amended by Chapter 127 of the Laws of 1970 effective July 1, 1970.

174.    Under the 1970 law, N.Y. Penal Law § 125.00 specifically included "an unborn child over twenty- four weeks" as a victim in the definition of Homicide.

175.    A deeply divided New York Court of Appeals upheld the state and federal constitutionality of the 1970 Act in *Byrn v. New York City Health & Hospitals Corp.*, 31 N.Y.2d 194, 286 N.E.2d 887, 335 N.Y.S.2d 390 (1972) (involving members of a class of pre-viable unborn children between four- and twenty-four-weeks gestation).

176.    At least one post-*Roe* case in New York has determined that a viable unborn child is entitled to rights guaranteed under the Fourteenth Amendment.  In *Boines v. Lavine*, 44 A.D.2nd 765, 766, 354 N.Y.S.2d 252, 253 (4th Dept. 1974) the appellate court reversed a denial of public assistance to the unborn child, even though the mother's financial situation was stable.  The court determined the lower court's decision was arbitrary, and as such "constituted a denial of equal protection of the law in light of section 602(a) (10) of 42 U.S.C., which provides that 'aid to families with dependent children shall be furnished with reasonable promptness to all eligible individuals.' " The appellate court noted "[New York] legislative and departmental regulations recognize that unborn children have needs separate and independent from those of its mother; that they are, therefore, eligible for public assistance and included among those benefited." *Id*. at 766.

177.    In 1978, the New York Court of Appeals held that parents were not entitled to sue for "wrongful life," rejecting plaintiffs' allegation that wrongful medical advice deprived them of the opportunity to terminate a pregnancy that resulted in the birth of a disabled child.  *Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978).

178.    New York courts have recognized an unborn child as a person for purposes of obtaining an order of protection. *In Gloria C. v. William C.*, 476 N.Y.S.2d 991, 124 Misc.2d 313, 314 (1984).

179.    New York law allows an unborn child to recover for torts sustained in *utero* if the child survives. *Leighton v. City of New York*, 39 A.D.3d 84, 85 830 N.Y.S.2d 749 (2007) (the law allows a cause of action for damages allegedly sustained by the infant plaintiff as a result of an accident which occurred when she was in *utero* and not viable outside the womb).

180.    Prior to January 2019, the State routinely prosecuted defendants for criminal abortion. *E.g., People v. Lohman, alias Madame Restell*, 1 N.Y. 379, 383 (1841); *People of New York v. Singer*, 300 N.Y. 120 (1949); *People v, Hayat*, 235 A.D.2d 289 (1995); *People of New York v. Gabriel Vega*, 2019 NY Slip Op. 1677 (3rd Dept. 2019).

181.    The State has routinely prosecuted license revocation actions against those physicians who have performed or are alleged to have performed unlawful abortions or legal abortions that resulted in injury or death.  *E.g., In the Matter of Vignendra Ariyarajah* (Board of Professional Medical Conduct No. 19-065); *In the Matter of Robert B. Rho* (BPMC 16-364); *In the Matter of Abu Hayat* (BPMC-92-13-A); *In the Matter of David Benjamin* (BPMC-93-79).

182.    With passage of the RHA on January 22, 2019, the New York legislature rejected almost two centuries of legal recognition of and protection for the "unborn quick child."

183.    By passage of the RHA in the context of preexisting state statutes, New York has gone far beyond simply responding to "medical judgments made by private parties according to professional standards that are not established by the State."  *Blum v. Yaretsky*, 457 U.S. 991 (1982). New York now compels private health insurers to provide coverage for medically necessary abortions defined as an abortion which occurs on a pregnant woman according to New York Medicaid Model Contracts, funds all abortion services for the indigent while limiting

coverage of many prenatal services, and the state itself offers extensive abortion services through government hospitals and clinics. The State has disavowed or ignored all recognition of the lives of viable unborn children, as well as the lives of all unborn children who fail to survive lethal attacks or criminally negligent medical care, even when their mothers want the children. In short, the State has provided such significant encouragement to terminate a pregnancy through induced abortion that the choice to continue a pregnancy to term and give birth is effectively disfavored by the State.

### Human Development

184.    Immediately upon fertilization, the union of sperm and egg "sets in [motion a] train [of a] remarkable series of events that endows the oocyte with the capacity to divide and differentiate into the trillions of cells that comprise a new individual" with its unique DNA and character. *Jacinta Martin, et. al. Biochemical alterations in the oocyte in support of early embryonic development*, 74 Cell Mol Life Sci. 469-485 (2017). *See* also Declaration of Kathi Aultman, M.D., dated December 14, 2020 ("Aultman Decl.") Decl. ¶ 14.

185.    In weeks five to six the brain grows rapidly, making the head bigger than the rest of the embryo's body, and the heart starts to form its four chambers. At this point, the gestational sac with heartbeat can be "seen" on ultrasound. Kidneys, fingers and toes begin to form. Only at this point is the embryo connected to the placenta for nourishment via the umbilical cord. Aultman Decl. ¶ ¶ 17-34.

186.    In weeks seven through twenty-two, the unborn child develops functioning organs, nerves, and muscles, as well as physically manifesting its biological sex. Midway through this developmental period "quickening" occurs. The child's movements become coordinated and can be detected during ultrasound exams. Toward the end of this period, the child can hear sounds

from outside the womb and begins to suck his or her thumb. Aultman Decl. ¶¶ 34-57, 58.

187.    Unborn children at the twenty-one week mark are increasingly surviving premature birth and able to live outside the mother's womb; the twenty-one week mark in gestation represents the most recent point of viability. Aultman Decl. ¶ 68.

188.    In weeks twenty-three and twenty-four, a fetus is fully capable of living on its own separate from the mother if provided adequate neonatal support. Aultman Decl. ¶¶ 66-67.

189.    At weeks twenty-five and twenty-six, the third trimester, the fetus has increased brain function and eye opening, and the lungs continue to grow.  The fetus can grasp at things and progressively explore its surroundings.

190.    "Other than the physiologic changes that occur at birth in the circulatory and respiratory systems, there is no difference in the development of a baby in the womb at 25 weeks and one in the neonatal intensive care unit.  A preborn baby at 28 weeks would be more developed than a 25-week-old that has been born." Aultman Decl.  ¶ 10.

191.    The third trimester begins at twenty-eight weeks gestation.

192.    From week thirty onward, the nervous system grows to completion as the muscles are more defined and more fat is stored under the skin. Hair forms on the head and the genital organs finish forming.

193.    At week thirty-four, the fetus moves into position for birth, which is generally completed in weeks thirty-seven and thirty-eight.

**New York Abortion Practice**

194.    The New York State Department of Health's Office of Vital Statistics collects and publishes abortion data based upon reports from hospital and non-hospital abortion facilities.

The most detailed such report, published annually, is known as "Table 19: Induced Abortion Summary Information by Race/Ethnicity, New York State." It includes information concerning the number of induced abortions, the age /demographic / racial / geographic information on the mothers, the gestational age of the terminated embryo or fetus, the number of previous abortions, whether the abortion was performed in a hospital or not, what financial coverage was involved, and the type of abortion procedure performed. A report of the procedures used, and location of the abortions is titled "Table 25: Induced Abortion by Operative Procedure and Resident County, New York State 2017." New York State Department of Health does not, however, track the number of deaths of a wanted child by a harm-causing individual. Copies of the 2017 Induced Abortion tables are attached as Exhibit B.

195.    Data on induced abortions obtained in 2018 will not be available until January 11, 2021 or later according to the New York State Department of Health's response to a Freedom of Information Law request for the data by counsel.

196.    At the time of passage of the RHA, New York's abortion rate (29.6 per 1,000 women) was twice the national average (14.6 per 1,000 women).

197.    According to the New York State Department of Health, 77,810 induced abortions were performed on New York residents in 2017.

198.    Nearly half (37,275 or 49.6% of the total) of those abortions were paid for by Medicaid, while another 11,095, or 14.8% percent, were deemed "self-pay," leaving private insurance as the financially responsible party in just 35% of cases.

199.    Two-thirds of the total abortions (51,330) in the state were performed within New York City.

200.    Surgical abortions accounted for seventy-one percent (71%) of the total abortions

statewide, while twenty-nine percent (29%) of induced abortions were medical.  For New York City, seventy-five percent (75%) of the abortions were surgical.

201.    In the State of New York during 2017, every day more than four unborn children were aborted at twenty (20) weeks of gestation or later, resulting in 1590 fetal deaths.

202.    More than thirty-four percent (34%) of reported abortions in 2017 were performed on black women, while only twenty-three percent (23%) of all abortions were performed on white women, with the same percentage (23%) performed on Hispanic women.  Six percent (6%) of all abortions were performed on women of another or unknown race.

203.    Fifty-one percent of all New Yorkers are female.  Two thirds (66.1%) of all New Yorkers are white, while 18.8% are Hispanic, and only 15.7% are black, according to the U.S. Census Bureau 2013-2017 American Community Survey 5-Year Estimate.

204.    As Justice Clarence Thomas noted in his concurring opinion in *Box v. Planned Parenthood*, "there are areas of New York City in which black children are more likely to be aborted than they are to be born alive—and are up to eight times more likely to be aborted than white children in the same area." *Box v. Planned Parenthood of Indiana and Kentucky, Inc*., 139 S.Ct. 1780, 1791 (2019) (Thomas, J. concurring) (*citing* N. Y. Dept. of Health, Table 23: Induced Abortion and Abortion Ratios by Race/Ethnicity and Resident County New York State–2016, https://www.health.ny.gov/statistics/vital_statistics/2016/table23.htm).

205.    Almost six thousand (5,899) abortions were performed in New York in 2017 using the dilation and evacuation procedure. The dilation and evacuation procedure ("D&E") requires dilation of the woman's cervix to the extent needed to insert surgical instruments for removing fetal body parts. After dilation:

> [T]he woman is placed under general anesthesia or conscious sedation. The doctor, often guided by ultrasound, inserts grasping forceps through the woman's

cervix and into the uterus to grab the fetus. The doctor grips a fetal part with the forceps and pulls it back through the cervix and vagina, continuing to pull even after meeting resistance from the cervix. The friction causes the fetus to tear apart. For example, a leg might be ripped off the fetus as it is pulled through the cervix and out of the woman. The process of evacuating the fetus piece by piece continues until it has been completely removed. A doctor may make 10 to 15 passes with the forceps to evacuate the fetus in its entirety, though sometimes removal is completed with fewer passes. Once the fetus has been evacuated, the placenta and any remaining fetal material are suctioned or scraped out of the uterus. The doctor examines the different parts to ensure the entire fetal body has been removed.

*Gonzales v. Carhart*, 550 U.S. 124, 136 (2007). *See also* Aultman Decl. ¶ 77.

206.     According to ACOG [American College of Obstetricians and Gynecologists] Practice Bulletin No. 135 (2013, reaffirmed May 2019), the D&E procedure is used in 95% of abortions at gestational week thirteen (13) or later nationally.    Many of these procedures are performed without the administration of measures to stop the fetal heart or otherwise prevent the induction of painful stimuli throughout the dismemberment.

207.     Sixty-eight (68) unborn children were aborted in New York by saline injection in 2017. Saline abortion produces death similar to that resulting from acute salt poisoning of infants, oral salt poisoning of animals, and human and animal hypernatremia caused by other factors.    A needle is inserted through the mother's abdomen and 50-250 ml (as much as a cup) of amniotic fluid is withdrawn and replaced with a solution of concentrated salt. The baby breathes in, swallowing the salt, and is poisoned.    The chemical solution also causes painful burning and deterioration of the baby's skin.    Usually, after about an hour, the child dies in *utero*.

208.     It is troubling that so many abortions were performed by saline injection, given that the procedure is extremely dangerous to women, and largely abandoned due to the risks to the mother. Aultman Decl. ¶ 82.

### Reasons for and Dangers of Late-Term Abortion

209.     Peer-reviewed research and state reports of women's reasons for obtaining abortions

establish that women seeking post-twenty-week terminations rarely do so for reasons of fetal anomaly or life endangerment. The most common reasons women obtain late-term abortions are (1) difficulty deciding whether to terminate the pregnancy, (2) financial barriers, and (3) late detection of the pregnancy.

210. The abortion complication rate is 3%–6% at twelve to thirteen weeks gestation and increases to 50% and higher for abortions performed in the second and third trimester.

211. Based on reports of legal abortions performed between 1998 and 2010, abortions performed at eighteen weeks or later, the maternal mortality rate was 6.7 deaths per 100,000 abortion procedures, with the most common causes of death being hemorrhage and infection.

212. The maternal mortality risk of abortion at or after twenty-one weeks is more than 9 maternal deaths per 100,000 abortions, compared with about 7.5 maternal deaths per 100,000 live births as reported by the U.S. Centers for Disease Control.

213. Some abortion clinic advertising and consent forms warn women that childbirth is safer than undergoing an abortion after twenty-four weeks gestation.

214. Few abortion providers will perform abortions after twenty (20) weeks because of the substantial risk of complications. REPORT OF THE GRAND JURY at 3, In re County Grand Jury XXIII (2011) (Misc. No. 0009901-2008) (In 2013, Dr. Gosnell was convicted of three counts of first-degree murder for severing the spinal cords of infants born alive during failed abortions, one count of involuntary manslaughter in the death of a patient who was overdosed by his untrained staff, and twenty-one counts of performing illegal abortions on women who were more than twenty-four weeks pregnant. *Commonwealth v. Gosnell*, No. CP-51-CR-0001667-2011, defendant sentenced (Pa. Ct. Com. Pl., Phila. County May 15, 2013).

215. Some dangers associated with abortions performed after twenty-four (24) weeks gestation

are illustrated by the tragic case of Jamie Lee Morales.  Ms. Morales was twenty-four (24) to twenty-six (26) weeks pregnant, when she sought an abortion from Dr. Robert Rho.  During the abortion procedure, Rho severed Morales' uterine aorta, ripped her cervix and pierced her uterine wall.  "Profuse post-operative bleeding forced the doctor to perform another procedure, but that did not fix the damage, prosecutors said.  Rather than call an ambulance, prosecutors said, Rho sent Morales home with her sister, despite signs she was in grave condition, because he wanted to get back to seeing other patients."  Ms. Morales died later that night.  Originally charged with manslaughter, prior to the jury rendering its verdict Dr. Rho agreed to and was convicted of criminally negligent homicide.  Verena Dobnik, *Doctor in Badly Botched Abortion Is Tried for Manslaughter*, Associated Press (May 1, 2018) at https://apnews.com/article/cf1d789e5fc142c982a91cbdbabd7467.

216.    Peer-reviewed research reveals additional associations between induced abortion and placenta previa, preterm birth, and mental health problems, including mood disorders, substance abuse, and suicide.  *See* Aultman Decl.  ¶¶ 69-85; Coleman Decl. ¶ ¶ 13-34; and Shuping Decl. ¶¶ 40-59.

**Termination of Pregnancy Through Delivery and Surrender**

217.    In New York, as in all other states, women terminating their pregnancy through delivery are not required to parent the child.  A woman is permitted to voluntarily surrender her parental rights to an adoption agency both pre- and post-delivery. N.Y. Social Services Law § 384.  *See* also N.Y. Dom. Rel. Law § 111.

218.    New York law also permits a woman to abandon a newborn baby up to thirty days of age anonymously and without fear of prosecution if the baby is abandoned in a safe manner. A parent is not guilty of a crime if the infant is left with an appropriate person or in a suitable

location and the parent promptly notifies an appropriate person of the infant's location. N.Y. Penal Law § 260.00(2). A hospital, staffed police or fire station are examples of safe and suitable choices.  NY Office of Child and Family Services, Abandoned Infant Protection Act at https://ocfs.ny.gov/main/safe/.

219.    After six months of no contact with the mother, the infant may be adopted.  *In re: The Guardianship of Olivia Doe, a Child Alleged to be Abandoned*, 189 Misc.2d 512, 733 N.Y.S.2d 326, 2001 N.Y. Slip Op. 21463.

**Prenatal Loss**

220.    The most recent report from the New York Health Department identified 685 neonatal deaths and 2,238 perinatal deaths.  Neonatal deaths are deaths of children who are born alive and die within 27 days of birth. Perinatal deaths are the number of neonatal deaths plus spontaneous fetal deaths at twenty (20) or more weeks of gestation. Table 45: Infant Deaths, Neonatal Deaths, Post Neonatal Deaths and Perinatal Mortality By Resident County New York State–2017, at https://www.health.ny.gov/statistics/vital_statistics/2017/table45.htm.

221.    Parents who experience perinatal loss have four times higher odds of depressive symptoms and seven times higher odds of having symptoms of post-traumatic stress disorder compared with non-bereaved parents.  *Katherine Gold, et al*., Depression and Posttraumatic Stress Symptoms After Perinatal Loss in a Population-Based Sample, J Women's Health (Larchmt). 2016 Mar; 25(3):263-9. doi: 10.1089/jwh.2015.5284. Epub 2015 Aug 10.

222.    Parents who lose their unborn children due to violence experience even greater psychological harm.

223.    Perinatal loss is associated with increased risk of both psychiatric morbidity (corresponding to 1 per 25 women) and substance misuse (corresponding to 3 in 100 women) by

mothers.

## Risk of Violence During Pregnancy

224.    For over two decades, U.S. medical and public health communities have recognized that violence may be a more common problem for pregnant women, and have instituted routine screening and evaluation as part of prenatal care.

225.    Pregnant women are less likely to be able physically to protect themselves from attacks than women who are not pregnant.

226.    The Centers for Disease Control and Prevention ("CDC") determined that in the period between 2003 and 2014 approximately 15% of female homicide victims of reproductive age (18–44 years) were pregnant or postpartum.  This number is widely considered to underestimate the problem due to lack of inquiry and reporting by many states, including New York.

227.    Adolescent homicide victims are 3.7 times more likely to be pregnant than adult homicide victims.

228.    The odds of a female becoming a homicide victim are three times higher for those who experienced violence during pregnancy.

229.    The National Death Reporting System shows that 45.3% of pregnancy-associated homicides were associated with intimate partner violence ("IPV").

230.    The New York Violent Death Reporting system identifies two victims of homicide who were pregnant at the time of their deaths in 2015, four victims in 2016, and two victims in 2017. Data for 2018 is not available at this time.  Half of these homicides were the result of documented intimate partner violence.  *Homicide Deaths among Women Pregnant at Time of Death*, New York Violent Death Reporting System, 2015-2017.

231.    Five hundred and fifty-eight people in New York City were killed in domestic violence

incidents from 2010 to 2018, with more than half of those victims killed by spouses or partners. New York City Domestic Violence Review Committee: 2019 Annual Report at https://www1.nyc.gov/assets/ocdv/downloads/pdf/2019_frc_annual_report_final.pdf.

232.     Pregnancy-associated suicides are significantly more likely for women experiencing current or former intimate partner violence when compared with non-pregnancy-associated suicides.

233.     Since the passage of the RHA the number of New York women experiencing intimate partner violence has increased.

234.     Defendant Governor Andrew Cuomo acknowledged that reports of intimate partner and domestic violence incidents were increasing in a tweet dated April 6, 2020 (available at https://twitter.com/NYGovCuomo/status/1247181643976192001) (last visited September 15, 2020).

235.     According to newspaper accounts, there have also been multiple pregnant women who have been murdered since the passage of the RHA. New York tracks many victim characteristics associated with IPV <u>except</u> whether the victim is pregnant. New York City Domestic Violence Review Committee: 2019 Annual Report at https://www1.nyc.gov/assets/ocdv/downloads/pdf/2019_frc_annual_report_final.pdf.

236.     A comparison of the stories of pregnant women killed both before and after the passage of the RHA show its considerable impact:

> *Mia J.*, 32 (March 2014, Brooklyn, NY) Mia was nearly seven months pregnant when the baby's father (who was angry at Mia's decision to have the child) and his friend jumped her from behind and beat her so savagely that she was left blind in one eye.  Her child died several hours later from a fractured skull and starvation due to damage to the placenta. The father was convicted of first-degree abortion, first-degree burglary and third-degree assault, and sentenced to 32 years imprisonment.  Though the defendant denied involvement in the crime at trial, the jury was persuaded by evidence of internet searches performed on his computer

regarding how to kill a fetus. Had the crime occurred following passage of the RHA, he might never have been convicted, because the computer evidence may have been excluded as non-probative in the absence of any charges relating to the death of the fetus. https://patch.com/new-york/prospectheights/brooklyn-man-guilty-1st-degree-abortion-murdering-unborn-child.

Vanessa M., 19 (April 2014, Troy, NY) This young college student was strangled and burned to death mere days before the due date by her ex-boyfriend, who did not want her to give birth to his child. In affirming the defendant's 50-year sentence for murder, arson and abortion, the Appellate Division, Third Department said, "[G]iven the heinous nature of his actions and complete lack of remorse, we discern no abuse of discretion or extraordinary circumstances warranting a reduction of the sentence in the interest of justice." People v Vega, 2019 N.Y. Slip Op. 01677. Regarding the RHA, the Court commented: "Although the Legislature recently repealed N.Y. Penal Law § 125.45, our decision herein may affect prosecutions for acts that were committed prior to the effective date of the repeal. In that regard, we note that our conclusion does not raise the specter of criminalizing "justifiable abortional acts" that were performed by, or upon the advice of, a duly licensed physician based on the reasonable belief that abortion was necessary to preserve the life of the mother or that were performed within the first 24 weeks of a pregnancy (N.Y. Penal Law § 125.05 [former (3)]; see *People v Hall*, 158 AD2d at 77).[3]." After passage of the RHA conduct identical to Mr. Vega's intentional killing of the viable unborn child is no longer a crime. https://spectrumlocalnews.com/nc/triad/news/2016/06/1/gabriel-vega-murder-trial.

P. Marie R., 30 (Dec. 2016, Brooklyn, NY) Kidnapped and imprisoned for several days by strangers hired by her former boyfriend, Ms. R was repeatedly injected with drugs intended to induce premature labor resulting in a stillbirth. Ms. R was seven months pregnant at the time. She was comatose by the time police and Emergency Medical Services rescued her, with her born- alive child still attached to her via the umbilical cord. The child died by the time he reached the hospital. Ms. R was admitted to the hospital for several weeks with chemical burns and other injuries. Though the crime occurred a year before passage of the RHA, due to the change in the law prior to grand jury presentment, her former boyfriend, a physician, was only charged with assault on the mother and her born-alive son, as opposed to fetal homicide. The NYS Office of Professional Medical Conduct has consequently suspended the defendant's medical license. If the charges are reduced to misdemeanor charges, however, the suspension order will automatically terminate and the doctor, who, contrary to the desires of the mother, intentionally killed a viable unborn child, will get his license to practice medicine back. https://abc7ny.com/doc-accused-of-killing-pregnant-mistress-baby-appears-in-court/5218682/#:~:text=BROOKLYN%2C%20New%20York%20City%20(WABC,Ditmas%20Park%20home%20in%202016.

50

Livia A., 30 (May 2018, The Bronx, NY) A veteran of the wars in Iraq and Afghanistan, this young woman was stabbed by her fiancé when she was twenty-six weeks pregnant because he had imagined that she was unfaithful. She was bleeding for thirty minutes before she was able to crawl into the hallway for help. The attack resulted in critical injuries to the mother late in pregnancy, which she survived, but which caused the death of her wanted child. Following passage of the RHA, Ms. A inspired a legislator to file Senate Bill S.2408, which would have amended the N.Y. Penal Law to add the new crime of "Assault on a Pregnant Individual." The Senate shelved it without comment, hearing or vote. https://connecticut.news12.com/woman-recovers-after-stabbing-kills-fetus-38259919.

Jennifer I., 35 (February 2019, Queens, NY) Jennifer was five months pregnant when she was knifed in the stomach by her baby's father. Witnesses overheard her screams about protecting the baby. When her screams drew the attention of neighbors, the father killed the mom by stabbing her neck. The District Attorney initially filed charges of murder (of Ms. I) and criminal abortion, but the prosecutor was forced to withdraw the latter charge due to the RHA, which had passed two weeks earlier. Ms. I was survived by a 12-year-old son. https://nypost.com/2019/02/03/pregnant-woman-stabbed-to-death-in-queens/.

Ana D., 31 (May 2020, Staten Island) Ana, a mother of three, was shot at her home by a known assailant. Ana was seven months pregnant. The assailants have been charged with murder, but, as a result of the passage of section 125.05, as amended by the RHA, there is no murder charge for her viable unborn child. https://www.nytimes.com/2020/05/12/nyregion/staten-island-murder.html and https://www.silive.com/crime/2020/05/a-pregnant-woman-was-killed-in-brazen-home-invasion-is-her-unborn-child-a-victim-too.html.

Tatiana W. 27 (January 2020, Brooklyn, NY). Tatiana was strangled by her boyfriend and left on a street corner in front of her home. Tatiana was visibly pregnant and a mother to a two-year old son. As a result of the passage of section 125.05, as amended by the RHA, her assailant has not been charged with the murder of her unborn child. https://www.amny.com/new-york/brooklyn/boyfriend-charged-with-murder-of-pregnant-girlfriend-in-brooklyn/.

Ieasha M, 34 (July 2020, Schenectady, NY) "Esh", as she was known, a self-taught hair stylist, was pregnant at the time she was shot outside of a club. She was also the mother of a teenaged son. Research as revealed no arrests in the case. https://www.timesunion.com/news/article/Pregnant-woman-dies-10-days-after-Schenectady-15413227.php.

Elizabeth G., 19 (Sept. 2020, Canastota, NY) Lizzie, as she is known, was pregnant when she was stabbed to death by her husband. She was also a mom to a one-year old daughter. Her husband was charged with multiple counts,

including assault, criminal possession of a weapon, criminal contempt and obstruction of breathing, but not one single count for the murder of the unborn child. https://cnycentral.com/news/local/estranged-husband-charged-with-murder-in-pregnant-canastota-moms-death.

Vanessa P., 29 (October 2020, Queens, NY). Vanessa was thirty weeks pregnant when her boyfriend strangled her and left her on a sidewalk. A nearby surveillance camera recorded the man, Goey Charles, as he dragged her limp body out of the car onto the sidewalk, where he left her with a pair of gray sweatpants tied around her neck. As a result of the passage of section 125.05, as amended by the RHA, her assailant has not been charged with the murder of her unborn child. https://www.fox23.com/news/trending/man-accused-killing-pregnant-girlfriend-dumping-body-nyc-highway/UUHZYN36F5GAJPZPBXC453GXWI/.

Three domestic violence killings occurred in New York in a ten-day span. According to a recent article, Judy Harris Kluger, a retired state judge, said two of the recent killings — of Ms. Pierre and another woman separated from her husband — highlighted when victims are in the greatest danger: when they are leaving and when they are pregnant. https://www.nytimes.com/2020/10/27/nyregion/queens-murder-man-pregnant-woman.html. Most of these cases were publicized in part because of the late-term status of the pregnancy.

237.    Upon information and belief, there have been multiple unreported deaths of pregnant women due to IPV by virtue of the RHA's repeal of the medical examiner's authority to investigate such deaths.

## COUNT I

**SECTION 125.05 OF THE NEW YORK PENAL LAW, AS AMENDED BY THE RHA, VIOLATES THE SUBSTANTIVE DUE PROCESS RIGHTS OF PLAINTIFFS JANE SMITH, JILL PARK, THE VIOLENCE AGAINST WOMEN AND WOMEN LACKING RECOURSE CLASSES.**

238.    Plaintiffs Jane Smith and Jill Park, on behalf of themselves and the Violence Against Women and Women Lacking Recourse Classes, reallege and incorporate herein by reference

each and every allegation contained in ¶¶ 1 through 237 above.

239.    The Fourteenth Amendment of the United States Constitution states that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV.

240.    The Fourteenth Amendment is enforceable against states pursuant to 42 U.S.C.A. § 1983 which provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons . . .
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ."

42 U.S.C.A. § 1983 (West).

241.    Criminal abortion and fetal homicide laws, like all penal provisions, are designed to punish and deter wrongful conduct. *See Austin v. U.S.*, 509 U.S. 602, 610 (1993) (identifying punishment and deterrence as the purposes of the criminal law).  By redefining the word "person" to exclude human beings who are not "born and alive," and removing the intentional or criminally negligent killing or attempted killing of viable unborn children from the Penal Laws, New York essentially authorizes the killing or attempted killing of viable unborn children, thus incentivizing violence against mothers who choose to continue their pregnancies and viable unborn children.

242.    Section 125.05 of the N.Y. Penal Law, as amended by the RHA, suddenly authorized

and incentivized actions that were prohibited in New York law for almost two centuries and did

so in the face of brutal lethal attacks on pregnant women and their viable unborn children. Since

the repeal of these legal protections of pregnant women and their viable unborn children have

been in effect, such attacks have increased. The State created an increased danger from those

who attack pregnant women and their unborn children and has provided a mantle of authority

that enhanced the power of harm- causing individuals who attempt to kill pregnant women and

their unborn children.

243.    By enacting section 125.05 of the N.Y. Penal Law, as amended by the RHA, the State,

including Defendants Cuomo, James, Zucker, and Poole, violates Plaintiffs Jane Smith and Jill

Park's, and the Violence Against Women and Women Lacking Recourse Classes' substantive

due process right to freedom from state-created threats of violence guaranteed by the Fourteenth

Amendment of the United States Constitution.


## COUNT II

**SECTION 125.05 OF THE NEW YORK PENAL LAW, AS AMENDED BY THE RHA, VIOLATES THE CONSTITUTIONAL RIGHT TO LEGAL REDRESS OF PLAINTIFFS JANE SMITH, JILL PARK, AND THE WOMEN LACKING RECOURSE CLASS.**

244.    Plaintiffs Smith and Park, on behalf of themselves and the Women Lacking Recourse

Class, reallege and incorporate herein by reference each and every allegation contained in ¶¶ 1

through 243 above.

245.    Plaintiffs Smith and Park are survivors of domestic violence while pregnant.

246.    Plaintiffs Smith and Park challenge the re-definition of "person" in section 125.05 of the

New York penal law, as amended by the RHA, to exclude unborn viable children with which a female

has been pregnant for more than twenty-four weeks from the definition of "person" in the current New York statute defining victims of homicide.

247.    The RHA's exclusionary redefinition of "person" and the decriminalization of lethal attacks on an unborn child with which a woman has been pregnant for more than twenty-four (24) weeks, and indeed any viable unborn child of more than twenty weeks gestation, denies women who lose their unborn children redress for the injury they, their unborn children, and their families suffer.

248.    "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. 137, 163 (1803).

249.    The final clause of the First Amendment — the Petition Clause — guarantees the "right of the people . . . to petition the Government for a redress of grievances." U.S. Const., Amend. I.

250.    Prior to passage of the RHA, courts regularly convicted assailants both for the injuries suffered by the women they assaulted and for the viable unborn children they killed.  The ends of general and specific deterrence, as well as retribution were served by New York courts' ability to redress the pregnant women's injuries as well as the homicide of her viable unborn child. *People v. Gabriel Vega*, 2019 NY Slip Op. 1677 (3rd Dept. 2019).

251.    As recently as early 2020, at least three such cases involving pre-RHA assaults and homicides were pending before the courts of this State and awaiting trial.  Upon information and belief, at least two post-RHA cases are presently pending before the courts of this State and awaiting trial.  The Women Lacking Recourse Class includes women who have experienced the death of their unborn children while in the womb, and they, and all other women who have experienced IPV or a third-party criminal attack while pregnant, have suffered irreparable harm

by seeing and feeling their viable fetuses die while still within their womb.

252.    By eliminating criminal sanctions for attacks resulting in the stillbirth of a viable unborn child, and revising the legal definition of homicide to exclude conduct that causes the death of a viable unborn child or even "an unborn child with which a female has been pregnant for more than twenty-four weeks," section 125.05, as amended by the RHA, deprives women of protection and redress for the legal injuries of their viable unborn children and for the women themselves.

253.    Under section 125.05, as amended by the RHA, a grieving woman who loses her unborn child is no longer recognized as a mother and her unborn child is denied legal recognition as a unique, irreplaceable human being.  Denial of such legal recognition is contrary to the stated policy of the RHA to affirm the "fundamental right to choose to carry the pregnancy to term, to give birth to a child." N.Y. Public Health Act § 2599-AA (2).

254.    By precluding New York prosecutors or courts from punishing violent acts that kill a viable unborn child, the state of New York, including Defendants Cuomo, James, Zucker, and Poole, has denied effective redress as required by the First Amendment to the U.S. Constitution to Plaintiffs Jane Smith and Jill Park and the Women Lacking Recourse Class.

## COUNT III

**SECTION 2599-BB OF NEW YORK PUBLIC HEALTH LAW VIOLATES THE SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION RIGHTS OF VIABLE UNBORN CHILDREN BY PERMITTING THEIR DESTRUCTION FOR ANY REASON UP TO TWENTY-FOUR WEEKS GESTATION, OR, AFTER TWENTY-FOUR WEEKS GESTATION, FOR BROAD HEALTH REASONS, AND BY DECRIMINALIZING ASSAULTS ON AN UNBORN VIABLE CHILD.**

255.    Plaintiff Viable Unborn Children Class, through its proposed next friend, Mary Doe, realleges and incorporates herein by reference each and every allegation contained in ¶¶ 1

through 254 above.

256.    Plaintiff Viable Unborn Children Class challenges the validity of section 2599-BB.1 of the New York Public Health Code because it unlawfully deprives viable unborn children of their rights to life and liberty by authorizing their destruction for *any reason* up to twenty-four weeks gestation, or, after twenty-four weeks gestation, for *broad health reasons*.  Section 2599-BB.1 also deprives the Viable Unborn Children Class of their right to equal protection under the law. Section 125.05 of the Penal Code, as amended by the RHA, unlawfully deprives viable unborn children of their rights to life and liberty by decriminalizing their death through the unlawful re-definition of "person" in the New York statute defining victims of homicide.

257.    The Viable Unborn Children Class, through its proposed next friend, Mary Doe, challenges the validity of section 2599-BB.1 of the New York Public Health Code because it unlawfully deprives viable unborn children of their rights to life and liberty by authorizing their destruction for *any reason* up to twenty-four weeks gestation, or, after twenty-four weeks gestation, for *broad health reasons*. Section 2599-BB.1 also deprives Viable Unborn Children Class of their right to equal protection under the law. Section 125.05 of the New York Penal Law, as amended by the RHA, unlawfully deprives viable unborn children of their rights to life and liberty by decriminalizing their death through the unlawful re-definition of "person" in the New York statute that defines victims of homicide.

258.    The Fourteenth Amendment of the United States Constitution states that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV.

259.    The Fourteenth Amendment is enforceable against states pursuant to 42 U.S.C.A. § 1983.

260.    The Fourteenth Amendment's guarantees of life, and liberty, and equal protection under the law are broad enough to include all human beings, including viable unborn children.

261.    The legal interests of viable unborn children have been recognized since early common law. This is evident from the centuries old and near universal rule that pregnant women sentenced to death for their crimes are to be afforded a stay of execution. "The writ *de ventre inspiciendo*, to ascertain whether a woman convicted of a capital crime was quick with child, was allowed by the common law in order to guard against the taking of the life of an unborn child for the crime of the mother." *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 253 (1891).

262.    This protection of unborn children is still afforded by New York domestic law, NYS Correction Law §657, and enshrined as a treaty obligation of the United States through the ratification of the International Convention on Civil and Political Rights, Art. 6(5).

263.    Protection of the unborn child was not isolated to protection of pregnant women from execution by the death penalty. The inheritance rights of an unborn child are protected pending live birth. *Kelly v. Gregory*, 282 App. Div. 542, 125 N.Y.S.2d 696 (1953). New York Insurance Law §5102(d) defines "loss of fetus" as a "serious injury" under the No-Fault threshold laws, permitting a claim for automotive negligence to stand in court upon miscarriage or fetal death, whether in *utero* or immediately following birth. New York State Family Court Act §514 creates financial and legal liability on the part of a father to the mother for prenatal, confinement, and delivery expenses, including reimbursement to the State of medical benefits relating to same. New York Correction Law §611 mandates that all pregnant inmates in State custody be transferred to a suitable medical facility, "a reasonable time before the anticipated birth of said child," and that all restraints be removed, for the benefit of mother and the unborn viable child.

264.   New York has previously recognized that the protections of the Fourteenth Amendment apply to a viable unborn child. *Boines v. Lavine*, 44 A.D.2nd 765, 766, 354 N.Y.S.2d 252, 253 (4th Dept. 1974).

265.   Viability may occur as early as twenty-one to twenty-two weeks gestation.

266.   It is a medical fact that an unborn child is a human being. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 735–36 (8th Cir. 2008) (*en banc*).

267.   Medical knowledge has developed to the point that "facts have so changed, or come to be seen so differently" as to have eliminated any legal or medical justification of abortion after the unborn child is viable, absent a threat to the mother's life. *See Planned Parenthood of S.E. Pennsylvania v. Casey*, 505 U.S. 833, 855 (1992) (plurality op.).

268.   Evolving societal and medical notions of what constitutes liberty compel an enhanced understanding of substantive due process and equal protection principles for viable unborn children under the Fourteenth Amendment.

269.   The State, including Defendants Cuomo, James, Zucker, and Poole, has violated the fundamental rights of viable unborn children by enacting N.Y. Public Health Law § 2599-BB.1 and N.Y. Penal Law § 125.05, as amended by the RHA.

270.   Specifically, N.Y. Public Health Law § 2599-BB.1 and N.Y. Penal Law § 125.05, as enacted by the RHA, violate the substantive due process rights of the Viable Unborn Children Class to the extent that these statutes:

   a.   Permit the "any reason" killing of a viable unborn child up to twenty-four weeks gestation;

   b.   Permit the killing of a viable unborn child of any gestational age – indeed up until

the moment before birth – for broad health reasons, or health reasons that are so vague and undefined, such that the phrase renders section 2599-BB.1 invalid and unenforceable;

c.  Permit the killing of a viable unborn child of any gestational age for non-medical reasons such as the mother's age or familial status that are insufficient to override the viable unborn child's interests, rights, or those of the State itself;

d.  Fail to protect the state's interests in the life and development of a viable unborn child, while disregarding the clear health and safety dangers to women that are present in the performance of post-viability abortions;

e.   Empower harm-causing individuals who attempt to force women to abort or who seek to directly kill post-viable children through the elimination of deterrent effects and punitive consequences. *See Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009); or

f.  Redefine statutory terms to provide public funding, use of public facilities, and services of public employees to abort viable unborn children, thereby directly further depriving viable unborn children of their most basic human and constitutional right – the right to life.

271.  Each statutory change represents a state-created danger and new mantle of government authority denying substantive due process to unborn viable children, their mothers, and other family members.  *See National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988) and *Citizens for Health v. Leavitt*, 428 F.3d 167, 181 (3rd Cir. 2005) ("the fact that a private party changed its behavior in response to a law does not give the law the coercive quality upon which the state action inquiry depends unless the law itself suddenly authorized something that

was previously prohibited" (emphasis in the original)).

272.    Specifically, N.Y. Public Health L. 2599-BB.1 and 125.05 of the New York Penal Code, as amended by the RHA, violate the Equal Protection rights of the Viable Unborn Children Class to the extent that they:

  a.  Treat viable unborn children of less than twenty-four weeks gestation differently than similarly situated viable unborn children greater than twenty-four weeks gestation; the former can be killed for any reason, the latter for reasons relating to the life and health of the mother;

  b.  Treat viable unborn children differently than similarly situated viable born children, who enjoy all of the rights, privileges, and immunities afforded human beings under the Constitution, including the right to obtain justice for murder by a person other than the child's mother, even though there is no medical or logical reason to do so; and

  c.  Recognize the State's interests to life and continuing development held by born children, but fail to protect the State's interests in the life and development of viable unborn children.

273.    There is no physical or legal distinction that would justify the difference in treatment between an unborn child two seconds prior to birth and a born child two seconds after birth. Both are fully developed human beings.  Both are dependent upon others for care. Both are capable of feeling pain, hunger, extreme temperatures, and discomfort. Under the N.Y. Public Health Law § 2599-BB.1 and N.Y. Penal Law § 125.05, as amended by the RHA, however, the viable unborn child may be killed with impunity, while the same child, having emerged from the birth canal seconds earlier, is a constitutionally protected person whose life is protected by statutory and

constitutional law.

274.    Indeed, a viable unborn child may be more developed that a born premature child.

275.    These violations of substantive due process and equal protection arise from the political insularity of viable unborn children whose mothers want to abort them.

276.    Viable unborn children constitute a discrete and insular minority for whom the ordinary political processes will not afford adequate political protection, and therefore statutes uniquely burdening this group require more searching judicial inquiry.

277.    The State, including Defendants Cuomo, James, Zucker, and Poole, has illegally discriminated against vulnerable viable unborn children, in part, because of invidious discrimination based upon a political agenda hostile to vulnerable, politically controversial, and unprotected human beings.

278.    The State, including Defendants Cuomo, James, Zucker, and Poole, has denied the most vulnerable and politically controversial group of human beings fundamental rights and equal protection under the laws, and in doing so has stripped them of life, liberty, equal protection, autonomy, dignity, and justice.

## COUNT IV

**SECTION 125.05 OF THE NEW YORK PENAL LAW, AS AMENDED BY THE RHA, VIOLATES THE CONSTITUTIONAL RIGHT TO LEGAL REDRESS OF THE VIABLE UNBORN CHILDREN CLASS.**

279.    The Viable Unborn Children Class, by its proposed next friend, Mary Doe, realleges and incorporates herein by reference each and every allegation contained in ¶¶ 1 through 278 above.

280.    The Viable Unborn Children Class challenges the re-definition of "person" in section 125.05 of the N.Y. Penal Law, as amended by the RHA, to exclude unborn viable children with which a

female has been pregnant for more than twenty-four weeks.

281.    The RHA's redefinition of "person" and decriminalization of lethal attacks on an unborn child with which a woman has been pregnant for twenty-four (24) weeks or longer denies members of the Viable Unborn Children Class redress for the injury they suffer at the hands of criminal and criminally negligent assailants.

282.    "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. 137, 163 (1803).

283.    The final clause of the First Amendment — the Petition Clause — guarantees the "right of the people . . . to petition the Government for a redress of grievances." U.S. Const., Amend. I.

284.    Prior to passage of the RHA, courts could convict assailants both for the injuries suffered by the women they assaulted and for the viable unborn children they killed.  The ends of general and specific deterrence, as well as retribution, were served by New York courts' ability to redress the pregnant women's injuries as well as the homicide of her viable unborn child. *People v. Gabriel Vega*, 2019 NY Slip Op. 1677 (3rd Dept. 2019).

285.    Research reveals a number of fetal homicide cases, both pre-RHA and post-RHA. These viable unborn children have suffered irreparable harm at the hands of a criminal assailant.

286.    By eliminating all criminal sanctions for attacks resulting in the stillbirth of a viable unborn child, and revising the legal definition of homicide to exclude conduct that causes the death of "an unborn child with which a female has been pregnant for more than twenty-four weeks," or any viable unborn child, the RHA deprives members of the Viable Unborn Children Class protection and redress for their legal injuries.

287.    Under N.Y. Penal Law § 125.05, as amended by the RHA, an unborn child is denied

legal recognition as a unique, irreplaceable human being.

288.    By placing members of the Viable Unborn Children Class in more harm, and by denying them long-standing legal protection previously afforded to them by New York penal law, New York is acting contrary to its state interests in the potential life of the viable unborn child, as well as the child's development.

289.    By precluding New York courts from punishing violent acts that kill a viable unborn child, the State of New York, including Defendants Cuomo, James, Zucker, and Poole, has denied effective redress as required by the First Amendment to the U.S. Constitution to members of the Viable Unborn Children class who are killed, or almost killed, by criminal or criminally negligent conduct.

## COUNT V

**THE REPEAL OF THE SECOND PHYSICIAN REQUIREMENT FOR ABORTIONS AFTER VIABILITY VIOLATES THE SUBSTANTIVE DUE PROCESS RIGHTS OF CHILDREN BORN ALIVE DURING ATTEMPTED ABORTIONS AFTER THE TWENTIETH WEEK OF PREGNANCY.**

290.    The Abortion Survivors Class, by their proposed next friend, Ann Jones, realleges and incorporates herein by reference each and every allegation contained in ¶¶ 1 through 289 above.

291.    The Fourteenth Amendment of the United States Constitution states that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV.

292.    The Fourteenth Amendment is enforceable against the states pursuant to 42 U.S.C.A. § 1983.

293.    The Abortion Survivors Class challenges the RHA provision repealing N.Y. Public Health Law § 4164.1 requiring that "[w]hen an abortion is to be performed after the twentieth week of pregnancy, a physician other than the physician performing the abortion shall be in attendance to take control of and to provide immediate medical care for any live birth that is the result of the abortion."

294.    New York's repeal of the second-physician requirement removes a necessary safeguard for children who are born alive during an abortion attempt.  Absent the presence of a second physician, such children are imminently threatened with denial of necessary medical treatment and subsequent misclassification of their deaths as "spontaneous fetal death[s]."

295.    The State, including Defendants Cuomo, James, Zucker, Hengerer, Astin, and Benson, has created a further danger to the Abortion Survivor Class members by allowing an unspecified "health care practitioner" – not just a physician – to perform an abortion when the practitioner determines that an abortion is necessary to protect the mother's life or "health," or that the unborn child is not viable.  There is no definition of "health." There is no direction as to who is a "health care practitioner" aside from the practitioner being someone licensed under Title 8 of the Education Law and acting within his or her "scope of practice."  Essentially, an Abortion Survivors class member is not only denied the care of a second physician, but potentially the care of any medical care provider with knowledge about the specialized needs of neonates delivered prior to the natural completion of the baby's gestation.

296.    Moreover, the Defendants have created an inherent conflict of interest between the injured born-alive child and the health practitioner, particularly where there may be liability to the mother for failure to successfully kill the child prior to live birth, and simultaneously to the child surviving the attempted abortion for injuries resulting from the attempted dismemberment or salt

poisoning prior to the child's birth, or from neglect or intentional failure to stabilize the child after live birth.

297.    These deaths from the denial of medical care are the result of a danger created by the Defendants' repeal of the law, and the failure of Defendants Cuomo, James, Zucker, Hengerer, Astin, and Benson to create alternative means of deterring denial of care and misclassification of children born alive as spontaneous fetal death.   Such misclassification avoids investigation, prosecution, and punishment of wrongdoers.

## COUNT VI

### THE FAILURE TO ENSURE PROPER REPORTING OF LIVE BIRTHS RESULTING FROM ATTEMPTED ABORTIONS AFTER VIABILITY VIOLATES THE EQUAL PROTECTION RIGHTS OF THE ABORTION SURVIVORS CLASS.

298.    The Abortion Survivors Class, by their proposed next friend, Ann Jones, realleges and incorporates herein by reference each and every allegation contained in ¶¶ 1 through 297 above.

299.    Live births occur after attempts to induce abortions.  After mid-trimester abortions became legal in New York, thirty-eight (38) live births following induced abortion were recorded in Upstate New York between July 1970, and December 1972. G. Stroh & A. Hinman, *Reported live births following induced abortion: Two and one-half years' experience in Upstate New York*, 126 Am. J. Obstetrics and Gynecology 83-90 (1976).

300.    While prior N.Y. Public Health Law § 4164 (3) required the attending physician to maintain medical records of any live birth occurring during an induced abortion, and of all life-sustaining efforts put forth for the sustain the life of child until January 22, 2019, the New York Department of Health has never released information on the number of live births occurring during or after attempts to abort an unwanted child.

301.    In an analysis of infant deaths coded "Termination of pregnancy, affecting fetus and newborn" between 2003 and 2014, the CDC recorded 588 such cases. Of those 588, at least 143 cases could "definitely be Classified as involving an induced termination." The CDC acknowledged that 143 cases is likely underestimated due to vagueness of terminology and lack of clarity about whether the abortion was spontaneous or induced. CDC, Mortality Records with Mention of International Classification of Diseases-10 code P96.4 (Termination of Pregnancy): United States, 2003-2014, at https://www.cdc.gov/nchs/health_policy/mortality-records-mentioning-termination-of- pregnancy.htm.

302.    Recent testimony before a September 10, 2019 hearing by U.S. House Republicans identified another 160 induced abortions resulting in live births based on state reporting in Arizona, Florida, Indiana, Michigan, Minnesota, Oklahoma, and Texas. Testimony of Tessa Longbons, Hearing of the House Republican Members of the Judiciary Committee Regarding H.R. 962, "Born-Alive Abortion Survivors Protection Act" Sept. 10, 2019. Written testimony is available          https://www.republicanwhip.gov/wp-content/uploads/2019/09/Longbons-Tessa-Testimony-9.10.19 -Born-Alive-Hearing.pdf.

303.    The disturbing case of abortionist Kermit Gosnell also confirms that babies can be born alive following an abortion.  Gosnell is currently serving three life sentences for first-degree murder of three infants born alive following failed abortions and involuntary manslaughter for the death of a woman undergoing an abortion at his Philadelphia clinic.

304.    New York law defines "live birth" or "birth" as:

the complete expulsion or extraction from its mother of a product of conception, regardless of the duration of pregnancy, which after expulsion or extraction shows evidence of life, such as breathing, beating of the heart pulsation of the umbilical cord or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.

N.Y. Public Health Law §201.01(a). Cf. 1 U.S.C. § 8(b). *See Proctor v McShane*, 56 Misc. 3d 626, 637, 55 N.Y.S.3d 864, 873 (Schoharie Cty. Sup Ct. 2017) (mother may recover damages for emotional distress related to medical malpractice resulting in miscarriage absent an independent injury to the mother).

305.    When an abortion attempt results in a live birth, the child is separate, distinct, and ultimately physically independent from his or her mother (notwithstanding a brief period prior to the cutting of the umbilical cord or detachment of the placenta).   All states and the federal government recognize a legal person at the time of birth. *See, e.g.*, U.S. Const. Amend. XIV, § 1 ("All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States"); and N.Y. Exec. Law §291(3) ("The opportunity to obtain medical treatment of an infant prematurely born alive in the course of an abortion shall be the same as the rights of an infant born spontaneously.").

306.    A hospital or state-run facility cannot have a policy or custom denying medical care in order to deprive the newborn child of his or her life.   Pursuant to the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), applicable Medicaid regulations, and a recent memorandum of guidance from the U.S. Department of Health and Human Services, every infant born alive, at any stage of development, is entitled to be screened, stabilized and treated. *Interaction of the Emergency Medical Treatment and Labor Act (EMTALA) and the Born- Alive Infants Protection Act of 2002*, QSO-05-26 at https://www.cms.gov/Medicare/Provider-Enrollment-and-

Certification/SurveyCertificationGenInfo/Policy-and-Memos-to-States-and-Regions-Items/QSO-05-26.

307.    A child who is born alive after an attempted abortion is similarly situated to a child who

survives efforts of healthcare personnel to assist in a live delivery.

308.    Many obstetricians and neonatologists are unfamiliar with the legal definition of "live birth," and use varying definitions in determining whether to report an event as a "live birth" or a "spontaneous fetal death." Ramsay, S. M., & Santella, R. M., *The definition of life: a survey of obstetricians and neonatologists in New York City hospitals regarding extremely premature births*.15 Maternal and Child Health Journal, 446–452 (2011).

309.    Some children who survive abortion and die within a short period of time are reported as a spontaneous fetal death due to the variety of ways physicians define the terms "live birth" and "spontaneous fetal death."  The lack of guidance on this issue leads to underreporting of neonatal deaths in New York. Lee E, Toprani A, Begier E, Genovese R, Madsen A, Gambatese M. Implications for improving fetal death vital statistics: Connecting reporters' self-identified practices and barriers to third trimester fetal death data quality in New York City. Maternal Child Health J. 20(2):337– 46. 2016.

310.    It is a reasonable inference that New York children are currently surviving abortion attempts based on the 1970 reports of New York children who survived abortion attempts, contemporary official reports of such survivors by states that require such reporting, and the documented failure of New York physicians to apply statutory definitions of live birth and spontaneous fetal death. *Cf. O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("[P]ast wrongs are evidence bearing on whether there is real and immediate threat of repeated injury").

311.    New York operational manuals for Basic Life Support and Advanced Life Support Emergency Medical Services authorize EMTs to deliver non-mechanical respiration support and hospital transport care only, as opposed to the thorough medical treatment that such infants are entitled to pursuant to New York State's Human Rights Law, Executive Law § 291.

312.    It is a reasonable inference that some New York children, including members of the Abortion Survivors Class, are denied necessary life- saving treatment in the absence of a second physician to take control of and to provide immediate medical care to the child.

313.    It is a reasonable inference that some New York children, including members of the Abortion Survivors Class, currently surviving abortion attempts are denied necessary life- saving treatment because New York no longer requires that a physician perform an abortion, and instead authorizes any "health care practitioner" licensed pursuant to title 8 of the education law and acting in his or her lawful scope of practice to perform an abortion.

314.    A mother cannot deprive a child of life-saving treatment. *Matter of Storar*, 52 N.Y.2d 363, 380 (N.Y. 1981). *See also* Family Ct. Act § 1012[f] [i][A] (a parent's failure to provide a child with adequate medical care is child neglect under New York state law).

315.    A physician providing emergency care to sustain the life of a child who survives an attempted abortion will not be liable for failing to obtain the consent of the child's parents. N.Y. Public Health § 2805-d(2).

316.    The State, including Defendants Cuomo, James, Astin, Hengerer, Zucker, and Benson, has failed to investigate such underreporting or establish professional education requirements to assure obstetricians and neonatologists understand the legal definition of "live birth," and properly report the termination of each pregnancy, whether as an abortion, a "live birth," or a "spontaneous fetal death."

317.    By simultaneously decriminalizing abortions and repealing the second physician requirement – or any physician requirement -- for abortions after the twentieth week of pregnancy, while failing to establish a program to assure obstetricians and neonatologists understand the legal definition of "live birth," and properly report the termination of each

pregnancy, whether as an abortion, a "live birth," or a "spontaneous fetal death," Defendants Cuomo, James, Zucker, Hengerer, Astin, and Benson have deprived children born alive during an attempted abortion after the twentieth week of pregnancy equal protection of the law to children born alive during attempts of healthcare personnel to assist with a live birth.

318.    These actions by state officials constitute a state-created danger leading to the deprivation of the plaintiff children's rights, *Okin*, 577 F.3d at 429 (2d Cir. 2009), while providing a mantle of authority that enhanced the power of harm-causing individuals who attempt to deny life-saving care to children who survive attempted abortions. *See National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988), and *Citizens for Health v. Leavitt*, 428 F.3d 167, 181 (3rd Cir. 2005) ("[T]he fact that a private party changed its behavior in response to a law does not give the law the coercive quality upon which the state action inquiry depends *unless* the law itself suddenly authorized something that was previously prohibited.") (emphasis in original).

## COUNT VII

### TWO TERMS OF SECTION 2599-BB.1 OF NEW YORK PUBLIC HEALTH LAW ARE VOID FOR UNDUE VAGUENESS.

319.    Plaintiff Dr. Amy Moe, on behalf of herself and the Physician Class, realleges and incorporates herein by reference each and every allegation contained in ¶¶ 1 through 318 above.

320.    Plaintiff Dr. Moe routinely receives questions from her clients about pregnancy and pregnancy options, including the termination of a pregnancy.

321.    Plaintiff Dr. Moe is specifically asked questions by her patients that relate to the appropriate factors for the termination of a pregnancy, including questions relating to the time

period within which an abortion would be permissible under New York law.

322.    The Fourteenth Amendment's due process clause requires that laws provide fair notice of what the law permits so that regulated parties know what is required of them and may act accordingly, and so that those enforcing the law do not act in an arbitrary or discriminatory way. *Hayes v. New York Attorney Grievance Committee of the Eight Judicial Dist.*, 672 F.3d 158, 168–69 (2d Cir. 2012).

323.    Plaintiff Dr. Moe challenges N.Y. Public Health Law §2599–BB.1 as unconstitutionally vague, failing to give the person of ordinary intelligence a reasonable opportunity to know who is subject to the law and what conduct is prohibited.

324.    Section 2599–BB.1 fails to provide adequate standards for those who apply it to guard against discriminatory or inconsistent application by those who enforce it. *Cf. Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir.1999).

325.    While New York Civil Rights law prohibits discrimination against individuals who refuse to perform or assist in an abortion due to conscientious objection, N.Y. Civ. Rts. § 79-I, health care workers forced to participate in abortions have no private cause of action against private employers. *Cenzon-Decarlo v Mount Sinai Hosp.*, 957 N.Y.S.2d 256, 258, 2012 N.Y. Slip Op. 08680, 2012 WL 6603089 (N.Y.A.D. 2 Dept., Dec. 19, 2012).

326.    During legislative debates preceding the passage of the RHA, the sponsor of the legislation threatened "medical professionals" providing healthcare services to pregnant women, stating that any medical professional who was confused by the text or did not understand his or her role under the RHA should be subjected to disciplinary charges and loss of license.

327.    The New York law criminalizes interference with the provision of reproductive health care services. N.Y. Penal Law §§240.70, 240.71, 240.72 and 240.73. Each of these laws carry felony

sentences ranging from one and 1/2 to fifteen years imprisonment. Individuals found to have violated these laws are also subject to loss of certification or license pursuant to disciplinary action.

328. In addition to the laws discussed above, Plaintiff Dr. Moe must practice medicine consistent with all other regulatory and legal or licensure requirements, including the duty not to breach or violate the appropriate standard of care with respect to her patients. That standard of care is the generally accepted method of care a doctor or other healthcare professional should administer to a patient afflicted with a specific condition

329. Plaintiff asserts that N.Y. Public Health Law § 2599–BB.1 of the RHA unconstitutionally subjects her to professional and criminal sanctions because § 2599–BB.1 is confusing and vague. The State does not provide adequate standards to preclude arbitrary enforcement against licensed professionals by government officials charged with enforcement of the law.

330. Notwithstanding public discussions of the vagueness of the statute, Defendants Cuomo, James, Zucker, Hengerer, Benson, Frescatore, and Astin have failed to provide guidance on this issue.

## COUNT VII (A)

### SECTION 2599-BB.1 OF NEW YORK PUBLIC HEALTH LAW IS VOID FOR VAGUENESS BECAUSE IT FAILS TO DEFINE WHO IS AUTHORIZED TO PERFORM ABORTIONS.

331. Plaintiff re-alleges and reaffirms each and every allegation set forth in ¶¶ 1 and 330 above.

332. Public Health Law § 2599–BB.1 authorizes surgical and medical abortions at any time during pregnancy to be performed by a "health care practitioner licensed, certified or authorized under title eight of the education law," with no definition of "health care practitioner."

333.    The term "health care practitioner" does not appear in Title 8 of the Education Law.

334.    The RHA authorizes the undefined "health care practitioner" to perform an abortion at any stage of pregnancy if said practitioner, in his or her "good faith professional judgment based on the facts of the patient's case," deems an abortion "necessary to protect the patient's life or health," with no definition of "health."

335.    The RHA thus exceeds *Roe*'s legalization of abortion by authorizing abortion despite fetal viability and even at the very moment of birth in what is essentially the unfettered discretion of an undefined "health care practitioner."

336.    Plaintiff Dr. Moe is aware that Public Health Law § 2599–BB.1 allows for health care practitioners other than "duly licensed physicians" to perform non-surgical and surgical abortions. Further, it permits abortions, including third trimester abortions, to occur in facilities other than hospitals.

337.    As a result of the RHA's failure to specify which "health care practitioners" may perform an abortion, Dr. Moe is unsure as to how to respond to her patients' questions or concerns about the qualifications or competency of any particular abortion provider or facility, and she lacks objective and important information for assessing post-abortive women for medical care.

338.    Plaintiff is uncertain who qualifies as "healthcare practitioners" and therefore permitted to perform abortions as the term is contained in N.Y. Public Health Law § 2599–BB.1 of the RHA.

339.    The lack of clarity and vagueness in the RHA have impeded her ability to fully and appropriately answer patient questions, address patient concerns, or provide full and complete assessments on post-abortive women.

340.    The lack of clarity and vagueness in the RHA makes a crucial difference in a family's decision about whether to abort or carry a live child to term.

341.    Prior to passage of the RHA, New York statutes limited performance of abortion to licensed physicians. N.Y Penal Law § 125.05 (repealed by the RHA).  Recent news reports note that some state officials also are uncertain as to the meaning of the law.  "The law says a health care provider acting within 'his or her lawful scope of practice' may perform an abortion, but it doesn't specify which practitioners can provide which types of abortion services.  That lack of detail has prompted the state's education department, which licenses health care professionals, to reach out to Gov. Andrew Cuomo and the Legislature to understand how the law applies to midwives and nurse practitioners." Marina Villeneuve, *Capitol Watch: Nurses, Midwives Look for Clarity on Abortion*, US News (Dec. 21, 2019) at https://www.usnews.com/news/best-states/new-york/articles/2019-12-21/capitol-watch-        nurses-midwives-look-for-clarity-on-abortion.

342.    N.Y. Public Health § 2599–BB.1 does not provide a person of ordinary intelligence a reasonable opportunity to know who is a "healthcare practitioner" whose scope of practice permits him or her to perform abortions.

343.    N.Y. Public Health § 2599–BB.1 is unconstitutionally vague because it provides no objective criteria that would guide public authorities, including Defendant Benson, Deputy Commissioner of the Office of the Professions and the Office of Professional Medical Conduct, in determining who is legally permitted to perform abortions – let alone the general public.

344.    Notwithstanding public discussions of the vagueness of the statute, Defendants Cuomo, James, Zucker, Hengerer, Benson, Frescatore, and Astin have failed to provide guidance on this issue.

**COUNT VII (B)**

**SECTION  2599-BB.1  OF  NEW  YORK  PUBLIC  HEALTH  LAW  IS**

**VOID FOR VAGUENESS BECAUSE IT FAILS TO DEFINE THE CIRCUMSTANCES WHEN A POST-24 WEEK ABORTION WOULD BE NECESSARY TO PROTECT A PATIENT'S LIFE OR HEALTH.**

345.    Plaintiff Dr. Moe, on behalf of herself and the Physician Class, re-alleges and reaffirms each and every allegation set forth in ¶¶ 1 through 344 of this Complaint as though fully stated herein.

346.    N.Y. Pub. Health Law § 2599–BB.1 permits abortions after twenty-four weeks gestation if the abortion is necessary to protect the patient's life or health.

347.    Plaintiff is uncertain what circumstances or conditions would be legally sufficient to permit an abortion after twenty-four (24) weeks gestation because it is "necessary to protect a patient's life or health" under N.Y. Pub. Health § 2599–BB.1.

348.    Neither the Reproductive Health Act nor the Public Health Law define "health" for purposes of N.Y. Pub. Health § 2599–BB.1.

349.    There are at least three possible interpretations of the phrase "necessary to protect the patient's . . . health."

a.  The least reasonable and unconstitutional interpretation would be that health is defined as a "medically necessary abortion," which is permissible any time a woman is pregnant. Effective January 1, 2017, the Medicaid Model Contracts have been altered, authorized, or approved by Defendants CUOMO, JAMES, ZUCKER, FRESCATORE, ASTIN, LACEWELL, and POOLE to re-define "medically necessary abortions" as "procedures, either medical or surgical, that result in the termination of pregnancy" ("Medicaid Health definition"). On information and belief, these model contracts have been and will continue to be used to reimburse abortion providers for all abortions, including abortions at or after twenty weeks

76

gestation.

b.  Another possible construction of "health" in the Reproductive Health Act would be that abortions are permitted after twenty-four weeks gestation if the healthcare practitioner determines that the abortion is necessary to protect the patient's health "in the light of all factors -- physical, emotional, psychological, familial, and the woman's age -- relevant to the well-being of the patient." *Doe v. Bolton*, 410 U.S. 179 (1973) (construing a Georgia statute permitting abortions to protect the "mother's life or health") ("*Doe v. Bolton* Health Definition").

c.  A third possible construction of "health" in the Reproductive Health Act would be that abortions are permitted after twenty-four weeks gestation if the healthcare practitioner determines that the abortion is necessary to "avert [the patient's] death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function." *Planned Parenthood of SE Pa. v. Casey*, 505 U.S. 833, 879 (1992) (plurality op.) ("*Casey* Health Definition").

350.  Plaintiff Dr. Moe's ability to fully and appropriately answer her patients' questions or address their concerns is hampered by the lack of clarity of the RHA.

351.  N.Y. Pub. Health § 2599–BB.1 is void for vagueness because it provides no objective criteria for determining when a post-twenty-four week abortion to protect a woman's life or health is permitted, nor does the statute provide a person of ordinary intelligence a reasonable opportunity to know if a post twenty-four week abortion is prohibited.

352.  Notwithstanding the vagueness of the statute, Defendants Cuomo, James, Zucker, Hengerer, Benson, Frescatore, and Astin have failed to provide guidance on this issue.

## PRAYER FOR RELIEF

**WHEREFORE,** these Plaintiffs respectfully pray the Court, to**:**

(1)    Appoint Plaintiff MARY DOE to serve as legal representative or next friend, pursuant to Federal Rules of Civil Procedure Rule 17(c)(2), for the limited purposes of representing in this action viable unborn children who are (1) subject to being aborted due to N.Y. Public Health Law §2599-BB.1; or (2) who are wanted, but killed at the hands of a harm-causing individual and have no right to redress for their death (the "Viable Unborn Children Class")  as a result of the modification of N.Y. Penal Law §125 by the RHA.

(2)    Appoint Plaintiff ANN JONES to serve as legal representative or next friend, pursuant to Federal Rules of Civil Procedure Rule 17(c)(2), for the limited purposes of representing in this action children who survive abortion ("Abortion Survivor Class").

(3)    Declare N.Y. Public Health Law §2599-BB.1 contains an *unlawful legislative presumption* of viability at twenty-four weeks gestation;

(4)    Declare N.Y. Public Health Law §2599-BB.1 is *unconstitutional in scope* because the post-twenty-four weeks "health" exception for an abortion should, on substantive due process and equal protection grounds, be limited to a medical determination that the abortion is necessary to prevent the death of the mother, or a serious risk of the substantial and irreversible impairment of a major bodily function of the mother;

(5)    Declare N.Y. Penal Law § 125.05 *unlawfully redefines "person"* to exclude viable unborn children when referring to homicide under the Penal Code;

(6)   Declare that the State's failure to require a second physician be present during a post-viability abortion in order to provide necessary medical care to children surviving abortion constitutes an *unconstitutional threat to children surviving an abortion*;

(7)   Declare that N.Y. Public Health Law §2599-BB.1  is *void for vagueness* because it fails to define "health" and "healthcare practitioner," two operative provisions of the RHA that are so vague as to preclude "persons of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."

(8)   Declare N.Y. Penal Law §125, including any other related or dependent provisions, as amended by the 2019 Reproductive Health Act, unlawful for violating the right to redress under the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and permanently enjoin the Defendants from enforcement and application of N.Y. Penal Law §125.05 unless it incorporates a constitutionally consistent definition of "person" that includes Viable Unborn Children;

 (9)   Permanently enjoin Defendant New York Health Department from allowing abortions to be performed on Viable Unborn Children absent a medical determination that a threat to the mother's life exists or that a substantial and permanent impairment of a major bodily function may occur that that can avoided only by induced abortion;

(10)  Declare that the Fourteenth Amendment's guarantees of life, and liberty, and equal protection under the law are broad enough to include all human beings,

including viable unborn children;

(11)  Grant each of the Plaintiffs such compensatory damages in any amount to be determined as the trier of fact;

(12)  Grant Plaintiffs their costs of this action, including litigation expenses, out– of– pocket expenses and reasonable attorneys' fees, in accordance with all applicable provisions of law, including but not limited to the provisions of 42 U.S.C.A. §§ 1988 and 12205; and

(13)   Grant Plaintiffs such other relief as may be just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury as to all issues so triable.

## NOTICE OF TRIAL COUNSEL

Please take notice that Teresa S. Collett, Esquire and Christen Elizabeth Civiletto, Esquire are hereby designated as Trial Counsel in the above-captioned matter.

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the within captioned Plaintiffs' Complaint was served by process server on the below defendants:

Governor Andrew Cuomo
Governor of the State of New York
NYS State Capitol Building
State Street and Washington Avenue
Albany, New York 12224

Letitia James
Attorney General of New York State
New York State Office of the Attorney General
28 Liberty Street
New York, New York 10005

Howard A. Zucker, M.D., J.D.
Commissioner of Health
New York State Department of Health
Corning Tower, Empire State Plaza
Albany, New York 12237

Deirdre Astin
Deputy Director Division of Hospitals and Diagnostic
and Treatment Centers
Corning Tower, Empire State Plaza
Albany, New York 12237

Sarah Benson
Deputy Commissioner
New York State Department of Education Office of Professional Discipline
1411 Broadway, Tenth Floor
New York, New York 10018

Arthur S. Hengerer, M.D.
Chair-New York State Department of Health Office of Professional Medical Conduct
Office of Professional Medical Conduct
New York State Department of Health
Riverview Center
150 Broadway, Suite 355
Albany, New York 12204-2719

Donna Frescatore
Department of Health
Empire State Plaza
Corning Tower, Room 1466
Albany, New York 12236

Sheila J. Poole
Capital View Office Park
52 Washington Street
Rensselaer, New York 12144

## CERTIFICATION

The undersigned hereby certifies that to my knowledge the above captioned matter at issue in this litigation is not the subject of any other civil action or arbitration.

Respectfully submitted,

_____
Teresa S. Collett, Esquire
2189 Sargent Avenue
Saint Paul, MN 55105
Telephone: (651) 271-2958
Email: Teresa.S.Collet@gmail.com
Application for Admission pending
*COUNSEL FOR PLAINTIFFS*

_____
Christen Elizabeth Civiletto, Esquire
8313 West Point Drive
East Amherst, New York
14051
Telephone: (716) 713-2431
Email: christenciviletto@gmail.com
N.D.N.Y. Atty. Bar Roll # 702121
*COUNSEL FOR PLAINTIFFS*